## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

| | | |
|---|---|---|
| **KAREN CAHALL** | : | **Case No. 1:24-cv-00688** |
| **Plaintiff,** | : | **JUDGE DOUGLAS COLE** |
| **v.** | : | |
| **NEW RICHMOND EXEMPTED** | : | |
| **VILLAGE SCHOOL DISTRICT** | | |
| **BOARD OF EDUCATION, et al.** | : | |
| **Defendants.** | : | |

## DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS

Defendants, the New Richmond Exempted Village School District Board of Education, Tracey Miller, Todd Wells, Tim Dufau, Robert Wooten, Jonathan Zimmerman, and Amy Story, respectfully move for judgment on the pleadings as to all claims in this case. This motion is supported by the accompanying memorandum of law.

Respectfully submitted,

/s/ Tabitha Justice
Brian L. Wildermuth (0066303), Trial Counsel
bwildermuth@swjohiolaw.com
Tabitha Justice (0075440), Trial Co-Counsel
tjustice@swohiolaw.com
SUBASHI, WILDERMUTH & JUSTICE
The Greene Town Center
50 Chestnut Street, Suite 230
Dayton, OH 45440
(937) 427-8800
(937) 427-8816 (fax)
*Counsel for Defendants*

## I.    INTRODUCTION

This case arises out of a three-day suspension issued to an elementary school teacher who incorporated controversial reading materials into her classroom without getting prior approval. The teacher was found by the school superintendent to have intentionally circumvented the book approval process.  There can be no dispute that Ohio law places the responsibility for book selection on the local boards of education.  Long-established legal precedent makes clear that teachers do not have constitutional rights to circumvent board policies or procedures or to provide students with books that reflect the teacher's own religious beliefs or morals.  The plaintiff's after-the-fact assertion of vague religious beliefs in support of her misconduct does not change that precedent or its impact on this case.

For the reasons set forth herein, the Court should grant judgment on the pleadings to the school district defendants and dismiss all claims in this case as a matter of law and with prejudice.

## II.    STATEMENT OF THE ALLEGATIONS

Plaintiff, Karen Cahall, alleges she has been employed as a teacher in the New Richmond Exempted Village School District for over thirty years.  (Doc. 1, Complaint, ¶ 4, PageID#3)  Prior to the beginning of the 2021-2022 school year, Cahall became aware that gender identity and related LGBTQ+ issues were considered controversial in the local school community.  (*Id.* ¶¶ 27-33, PageID#8-9)  Specifically, there had been "numerous complaints from community members opposing" a school district proposal to allow school staff to wear rainbow stickers or badges that would alert LGBTQ+ students that they were "safe" to confide in or seek advice from particular teachers.  (*Id.* at ¶¶ 27, 29, PageID#8)  As a direct result of these citizen complaints, the district prohibited the use of rainbow stickers for that purpose and prohibited the use of forms on which

1

students could provide their preferred gender identity and gender pronouns. (*Id*. at ¶¶ 29-30, PageID#8-9)

Cahall alleges that, "[f]ollowing the **controversy** in the New Richmond District over the wearing of the Rainbow [sic] stickers in 2021," she sought to educate herself on the emotional needs of LGBTQ+ students. (Doc. 1, Complaint, ¶ 38, PageID#10)(emphasis added) Subsequently, Cahall added four books to her classroom library that included LGBTQ+ characters. (*Id*. at ¶ 44, PageID#11) Cahall alleges the books "deal with characters who are LGBTQ+ and are coming to terms with feeling different and excluded simply because they are LGBTQ+." (*Id*. at ¶ 48) Cahall intended for these books to "serve as a positive tool" for her students "to promote [her moral and religious] values for any LGBTQ+ student who might come to her for guidance or support." (*Id*. at ¶ 49, PageID#12)

In her complaint, Cahall alleges she has a sincerely held "moral and religious belief" that all children deserve to be respected, accepted and loved for who they are. (*Id*. at ¶ 37, PageID# 10) She alleges she had a "sincerely held moral and religious belief[] that LGBTQ+ youth needed to have access to safe spaces and safe people at school." (*Id*. at ¶ 41, PageID# 11) Cahall does not allege in her complaint that she informed any district employee of her alleged "beliefs" prior to a disciplinary hearing related to the controversial books.[1] Cahall does not allege she ever sought to be excused from a work rule due to her alleged "religious" beliefs prior to a disciplinary hearing.

On November 6, 2024, Cahall was suspended for three days for placing controversial reading materials in her classroom without prior approval. (Doc. 1, Complaint, Ex. 2, PageID 29-30) That school year, Cahall's teaching assignment was a third-grade math and science classroom.

---

[1] Plaintiff states in her complaint that, in the disciplinary hearing of this matter, she "outlined to defendant Miller her sincerely held moral and religious reasons for keeping the books in her classroom." (Complaint, ¶ 59). This is false and in violation of Rule 11. However, the Court will accept this as true for purposes of this motion.

(*Id.*)  Cahall alleges that, in late October, a parent complained to the district that four books with LGBTQ+ themes were in Cahall's classroom.  (Complaint, ¶ 55)  Cahall was given notice of the accusations and she was given an opportunity for a pre-disciplinary meeting in which she could respond to the accusations against her.  (*Id.*; Complaint, ¶ 57-60, PageID# 14)  Cahall attached the "Notice of Suspension" to her complaint and relied upon it to support her causes of action in this case.[2]  (*Id.*)  That notice, signed by Superintendent Tracey Miller, specifies that Cahall was suspended for:

> [Y]ou engaged in an intentional and serious violation of Board policy and procedure. You acknowledged that you placed books in your **third-grade math/science classroom** library that contained themes and discussion of topics of a controversial nature that were not related to the instructional goals of the course of study and the level of maturity of the students in your classroom, as required by Board policy."  These books included Ana on the Edge.  The Fabulous Zed Watson.  Hazel Bly and the Deep Blue Sea, and Too Bright to See.
>
> You agreed that some of the topics contained in the books are controversial, although you do not believe that they should be.  You also agreed that you did not get permission to place these books in your classroom library.  You understood from what you referred to as the "rainbow controversy," that some of the topics discussed in the books were controversial."
>
> You also knew the books were not acceptable because you asked for them to be placed in the library and were denied.  You subsequently placed the books in your classroom library without putting them through the established approval process.

(Doc. 1, Complaint, Ex. 2, PageID# 29-30)(emphasis added)  That notice further goes on to find that Cahall intentionally defied the district's book approval process, because she knew the books would be rejected for not being related to the instructional goals of the course of study or appropriate for the level of maturity of the students in the classroom.  (*Id.* at 30)

---

[2] Normally, matters outside the pleadings may not be considered in ruling on a motion to dismiss unless the motion is converted to one for summary judgment under Rule 56. See Fed. R. Civ. P. 12(d). When a document is referred to in the pleadings and is integral to the claims, however, it may be considered without converting a motion to dismiss into one for summary judgment. *Doe v. Ohio State Univ.*, 219 F. Supp. 3d 645, 652-53 (S.D. Ohio 2016).

Cahall subsequently sued the Board of Education, the Superintendent, and individual school board members, alleging that she had been subject to religious discrimination under the First and Fourteenth Amendments. (Doc. 1, Complaint) She further alleged that the school policy requiring approval of controversial materials was overly vague on its face and as applied to her under the Fourteenth Amendment. Finally, she alleged a miscellaneous state law claim that the superintendent engaged in criminal interference with civil rights. The plaintiff included only official capacity claims against the members of the school board of education. She asserted both individual and official capacity claims against the school superintendent.

## III.    LAW AND ARGUMENT

### A. Applicable Standard for a Rule 12(c) Motion for Judgment on the Pleadings.

Rule 12(c) of the Federal Rules of Civil Procedure provides that, "[a]fter the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c). A motion for judgment on the pleadings is assessed "using the same standard that applies to a review of a motion to dismiss under Rule 12(b)(6)." *Moderwell v. Cuyahoga Cnty.*, 997 F.3d 653, 659 (6th Cir. 2021) (citations omitted).

"For purposes of a motion for judgment on the pleadings, all well-pleaded material allegations of the pleadings of the opposing party must be taken as true, and the motion may be granted only if the moving party is nevertheless clearly entitled to judgment." *Jackson v. Pro. Radiology Inc*., 864 F.3d 463, 466 (6th Cir. 2017) (quoting *S. Ohio Bank v. Merrill Lynch, Pierce, Fenner & Smith, Inc*., 479 F.2d 478, 480 (6th Cir. 1973)). However, the Court need not accept the plaintiff's legal conclusions as true. *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)). Moreover, the well-pleaded facts must be sufficient to "raise a right to

relief above the speculative level," such that the asserted claim is "plausible on its face." *Iqbal*, 556 U.S. at 678; *Twombly*, 550 U.S. at 546-47.

In Ohio federal courts, a plaintiff must "state[] a claim for relief that is plausible, when measured against the elements" of a claim. *Darby v. Childvine, Inc.*, 964 F.3d 440, 444 (6th Cir. 2020) (citing *Binno v. Am. Bar Ass'n*, 826 F.3d 338, 345-46 (6th Cir. 2016)). "To survive a motion to dismiss, in other words, [the plaintiff] must make sufficient factual allegations that, taken as true, raise the likelihood of a legal claim that is more than possible, but indeed plausible." *Id.* (citations omitted). Under this now well-established standard, courts ensure that claims meet a plausibility threshold before the defendants may be subjected to the potential rigors (and costs) of the discovery process. "Discovery, after all, is not designed as a method by which a plaintiff discovers whether he has a claim, but rather a process for discovering evidence to substantiate plausibly stated claims." *Green v. Mason*, 504 F. Supp. 3d 813, 827 (S.D. Ohio 2020).

"A Rule 12(c) motion 'is granted when no material issue of fact exists and the party making the motion is entitled to judgment as a matter of law.'" *Id.* (quoting *Paskvan v. City of Cleveland Civil Serv. Comm'n*, 946 F.2d 1233, 1235 (6th Cir. 1991)). For the reasons described below, Plaintiff Cahall has failed to plead claims that are plausible from a legal perspective, and the defendants are entitled to judgment as a matter of law. The plaintiff's complaint should be dismissed with prejudice.

**B. Plaintiff's Official Capacity Claims Should Be Dismissed.**

Cahall has sued school board members (her employers) Todd Wells, Tim Dufau, Robert Wooten, Jonathan Zimmerman, and Amy Story only in their "official" capacities as members of the Board of Education. (Complaint, ¶ 8, PageID#4) She has sued former superintendent, Tracey Miller, in both his official capacity and his individual capacity. (*Id.* at ¶ 7)

In Ohio, a board of education is "a body politic and corporate, and, as such, capable of suing and being sued. O.R.C. § 3313.17. School boards are further considered "political subdivisions" of the State of Ohio. O.R.C. § 2744.01(F). As a division of local government, the Board of Education may be sued directly for Section 1983 and Constitutional claims. See *Memphis Police Dept. v. Garner*, 471 U.S. 1, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985). Employees of the Board of Education may be sued for constitutional violations in two capacities – official and individual capacities. However, suing a government employee or elected official in his or her official capacity "generally represent[s] only another way of pleading an action against an entity of which an officer is an agent." *Kentucky v. Graham*, 473 U.S. 159, 165-66, 105 S. Ct. 3099, 87 L. Ed. 2d 114 (1985)(quoting *Monell v. New York City Dept. of Social Services*, 436 U.S. 658, 690 n. 55, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978)).

Here, Cahall has sued Defendants Wells, Dufau, Wooten, Zimmerman, and Story **only** in their official capacities for constitutional claims under § 1983. She has sued Defendant Miller in both capacities. Cahall has also sued the Board of Education itself. Any judgment against the individual defendants in their official capacities will, in reality, be a judgment against the Board of Education and will only be collectible against the Board of Education. Thus, the Section 1983 official capacity claims against the individual defendants are redundant and should be dismissed for failure to state a claim.

### C. The Board Policy was Not Unconstitutionally Vague on its Face or as Applied to Plaintiff (1st and 2nd Claims for Relief).

In her first and second claims for relief, Plaintiff Cahall alleges the school board's policy requiring prior approval of controversial classroom materials is unconstitutionally vague in violation of her right to due process under the Fourteenth Amendment. These claims are against both the Board of Education and Superintendent Miller respectively.

There are several obstacles to Cahall's due process arguments. First and foremost, the policy about which she complains is not the only thing that allows the school board to define what books are provided to students as part of their education. Rather, Ohio law and well-established legal precedent make clear that teachers do not have unfettered discretion in selecting classroom materials. Indeed, in a case remarkably similar to the current one, the Sixth Circuit explained that teachers simply do not have a constitutional right to select books for their students. See, *Evans-Marshall v. Bd. of Edn. of the Tipp City Exempted Village School Dist.*, 624 F.3d 332, 341 (6th Cir.2010).

In that case, Evans-Marshall alleged her teaching contract was terminated because she included banned books on a list of books students could select to read. Like the plaintiff in this case, she alleged that she did not compel the students to read any particular book. The Sixth Circuit found the teacher had no constitutionally protected right to pick books for students. The Court explained:

> Start with Ohio law. Under it, "[t]he board of education of each city . . . shall prescribe a curriculum." O.R.C. § 3313.60(A). State law gives elected officials--the school board--not teachers, not the chair of a department, not the principal, not even the superintendent, responsibility over the curriculum. This is an accountability measure, pure and simple, one that ensures the citizens of a community have a say over a matter of considerable importance to many of them--their children's education--by giving them control over membership on the board.
>
> The First Amendment does not ban this policy choice or this accountability measure. The Constitution does not prohibit a State from creating elected school boards and from placing responsibility for the curriculum of each school district in the hands of each board. Teachers no doubt are "required . . . to speak or write" and otherwise express themselves, *Garcetti*, 547 U.S. at 422,[3] but this does not make them "sovereign[s] unto [themselves]," Parate v. Isibor, 868 F.2d 821, 827 (6th Cir. 1989). "The curricular choices of the schools should be presumptively their own--the fact that such choices arouse deep feelings argues strongly for democratic means of reaching them." *Boring v. Buncombe County Bd. of Educ.*, 136 F.3d 364, 371-72 (4th Cir. 1998) (en banc) (Wilkinson, C.J., concurring). ***

---

[3] *Garcetti v. Ceballos*, 547 U.S. 410, 126 S. Ct. 1951, 164 L. Ed. 2d 689 (2006).

> The key insight of *Garcetti* is that the First Amendment has nothing to say about these kinds of decisions. An employee does not lose "any liberties the employee might have enjoyed as a private citizen" by signing on to work for the government, but by the same token, the government, just like a private employer, retains "control over what the employer itself has commissioned or created": the employee's job. *Garcetti*, 547 U.S. at 422. And that insight has particular resonance in the context of public education. Every child in Ohio must attend school, see O.R.C. § 3321.02, providing public school teachers with a captive audience for their in-class speech, see *Mayer*, 474 F.3d at 479, and providing a compelling reason for putting curricular choices in the hands of "someone [they] can vote out of office," id. at 479-80, or who is otherwise democratically accountable, see O.R.C. § 3311.71 (elected officials and other community institutions appoint school board members in certain municipal school districts).

*Evans-Marshall*, 624 F.3d at 341. In short, any teacher licensed in the State of Ohio should be presumed to know that school boards select curriculum, not teachers. Absent a constitutionally protected right, Cahall's due process arguments fall apart.

In addition, the school board policy about which Cahall complains specifically requires teachers to submit controversial materials to a committee for review and approval. (Doc. 1, Complaint, Exhibit 1, PageID# 27) Cahall claims that the words "controversial issue" and "instructional program" contained in the policy are unconstitutionally vague and open the door for arbitrary enforcement. Yet, at the same time, Cahall admits that she knew that LGBTQ+ matters were controversial in her school. She specifically alleges the books she chose for her third-grade math and science classroom "deal with characters who are LGBTQ+ and are coming to terms with feeling different and excluded simply because they are LGBTQ+." (Doc. 1, Complaint, at ¶ 48) She specifically alleges that she intended for these books to "serve as a positive tool" for her students "to promote [her moral and religious] values for any LGBTQ+ student who might come to her for guidance or support." (*Id*. at ¶ 49, PageID#12) Application of ordinary, common sense definitions of the words that Cahall deems vague in this particular case could only lead to the

8

conclusion that Cahall included controversial materials in her instructional program without prior approval.

The Supreme Court has found that a policy is so vague as to violate due process when it either: (1) fails to inform ordinary people what conduct is prohibited; or (2) allows for arbitrary and discriminatory enforcement. *Kolender v. Lawson*, 461 U.S. 352, 357, 103 S. Ct. 1855, 75 L. Ed. 2d 903 (1983). However, there is "substantially more room for imprecision in regulations bearing only civil, or employment, consequences, than would be tolerated in a criminal code." *Dade v. Baldwin*, 802 F. App'x 878, 885 (6th Cir. 2020) (citing *Arnett v. Kennedy*, 416 U.S. 134, 159-60, 94 S. Ct. 1633, 40 L. Ed. 2d 15 (1974) (plurality opinion); *Vill. of Hoffman Estates v. Flipside, Hoffman Estates*, 455 U.S. 489, 498-99, 102 S. Ct. 1186, 71 L. Ed. 2d 362 (1982)). Even where First Amendment values are at stake, "employment standards 'are not void for vagueness as long as ordinary persons using **ordinary common sense** would be notified that certain conduct will put them at risk'" of discipline. *Dade*, 802 F. App'x at 885 (quoting *San Filippo v. Bongiovanni*, 961 F.2d 1125, 1136 (3d Cir. 1992)(emphasis added)); *see Arnett*, 416 U.S. at 158-61. Due process "does not demand perfect clarity and precise guidance." *Hegwood v. City of Eau Claire*, 676 F.3d 600, 603 (7th Cir. 2012).

Based upon Cahall's own allegations, she knew LGBTQ+ issues were considered controversial in her school district, and she knew that giving her third-grade students books with those topics could put her at risk for discipline. Indeed, Superintendent Miller noted in the suspension letter that Cahall had tried to get the same books placed in the school library and was denied. Cahall's claim that the school district policy was too vague for an educator of more than 30 years to understand suggests she may not have the professional judgment to be a teacher and borders on the nonsensical. More importantly, Cahall does not cite a single instance during her

tenure in which the policy was not applied or applied differently in other contexts. She has alleged no facts to suggest that other teachers had not been required to have certain materials reviewed when those materials could reasonably be considered "controversial" under the plain language of the board policy.

Because school board work rules need not be precisely defined for all possible circumstances, the Court must find that the plaintiff's facial due process challenge fails as a matter of law. Because, the allegations in the complaint fully demonstrate that the plaintiff knew the subject matter of the books was controversial, her "as applied" due process challenge also fails as a matter of law. Counts 1 and 2 of the plaintiff's complaint should be dismissed.

### D. Plaintiff Failed to Plausibly Allege Her Employer Had Knowledge of a Sincerely Held Religious Belief (3rd Claim for Relief).

In her third claim for relief, Cahall alleges Defendant Miller "targeted [her] because of her sincerely held moral and religious beliefs in violation of the Equal Protection Clause of the Fourteenth Amendment." Specifically, Superintendent Miller suspended her for placing controversial (non-religion-based) materials in her classroom library without prior approval.

The Equal Protection Clause of the Fourteenth Amendment provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. To prevail on an equal protection claim, a plaintiff must demonstrate that the government treated her "disparately as compared to similarly situated persons and that such disparate treatment either burdens a fundamental right, targets a suspect class, or has no rational basis." *Center for Bio-Ethical Reform, Inc. v. Napolitano*, 648 F.3d 365, 379 (6th Cir. 2011). **The Equal Protection Clause, however, prohibits only intentional discrimination**. *See, e.g.*, *Stanford v. Northmont City Sch. Dist.*, 6th Cir. No. 23-3203, 2023 U.S. App. LEXIS 26336, at *12 (Oct. 2, 2023) (citing *Washington v. Davis*, 426 U.S. 229, 239, 96 S. Ct. 2040, 48 L. Ed. 2d 597 (1976).

At a bare minimum, for an employer to engage in intentional discrimination of an employee based upon the employee's religious beliefs, the employer necessarily must know that employee has religious beliefs, that those beliefs are in conflict with the work rule being enforced, and that an accommodation for that religious belief could be made. *Virts v. Consolidated Freightways Corp. of Delaware*, 285 F.3d 508 (6th Cir. 2002). To state a claim for religious discrimination, employees must have informed their employers of their religious beliefs prior to the alleged discriminatory action because, unlike other bases of discrimination claims like race or gender, an employee's religion is often unknown to the employer. *O'Connor v. Lampo Group, LLC*, M.D.Tenn. No. 3:20-cv-00628, 2021 U.S. Dist. LEXIS 188304, at *19-20 (Sep. 29, 2021), citing *Wilkerson v. New Media Tech. Charter Sch. Inc*., 522 F.3d 315 (3d Cir. 2008). At the pleading stage, the plaintiff's allegations must "raise a reasonable expectation that discovery will reveal evidence" that defendant knew about the plaintiff's protected status. *Twombly*, 550 U.S. at 556. The inference of knowledge from the allegations must be "plausible." *Iqbal*, 556 U.S. at 679.

In this case, Cahall alleges in her complaint that she holds a religious belief that all children are deserving of love, acceptance, and respect. Cahall does not, however, allege that she informed the school superintendent that this was her belief before she was in the disciplinary process. Moreover, she does not specifically allege that she informed Superintendent Miller that her beliefs about the importance of protecting LGBTQ students were religious in nature. Cahall does not allege she requested a religious accommodation from the district's book review policy even after she had been denied placement of the same books in the school library. (Complaint, Ex. 2) It remains unclear from Cahall's complaint what she specifically told Mr. Miller during the disciplinary process. However, common sense suggests that an ordinary school superintendent

could reasonably assume that **all** individuals who choose to go into the teaching profession have the philosophy or social belief that all children are deserving of love, acceptance, and respect. This is a secular theme common in the world of education. Nothing in the law would require the superintendent to assume that such beliefs were religious in nature.[4]

Absent some allegation of fact that would plausibly suggest that the school superintendent was aware that Cahall's "sincerely held" beliefs were religious in nature or that her religious beliefs were in conflict with a school rule, there is no plausible claim that the superintendent intentionally discriminated against her in violation of the Equal Protection Clause.

**E. Plaintiff Failed to Allege Plausible Comparator Evidence (3rd Claim for Relief).**

In her complaint, Cahall alleges she was treated differently than other school employees who were permitted to wear religious symbols on their clothing or send emails to other employees about faith-based events. However, Cahall does not allege she was disciplined because she wore pins or symbols related to her religion. Indeed, Cahall does not allege the district has a policy that prohibits staff from wearing religious symbols such that her alleged comparators would have been in violation of any work rule. Cahall also does not allege she was disciplined because she used email to promote a religious activity to her colleagues or even that the district had a policy prohibiting such conduct. Rather, Cahall alleges she was disciplined because she included controversial materials involving the topic of sexuality in her third-grade math and science classroom without prior approval. By her own admission, the Board had adopted an express policy on this subject. Cahall does not reference a single other teacher who provided students with

---

[4] When there is an "obvious alternative explanation," the Court does not need to accept Plaintiff's allegations of discriminatory treatment without more. *Ashcroft v. Iqbal*, 556 U.S. 662, 682, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009), quoting *Twombly*, *supra*, at 567, 127 S. Ct. 1955, 167 L. Ed. 2d 929.

religious reading materials, controversial materials, or even unapproved materials of any sort but who was not disciplined.

An element of an equal protection claim is that similarly situated, non-protected persons received more favorable treatment for similar acts. *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998) (considering claim under the Age Discrimination in Employment Act). To establish that an employee is an appropriate comparator, "the plaintiff [must] demonstrate that he or she is similarly situated to the [claimed comparator] in all relevant respects." *Ercegovich*, 154 F.3d at 353.

In the disciplinary context, courts have held that to be found similarly situated, the plaintiff and her proposed comparator must have engaged in acts of "comparable seriousness." *Clayton v. Meijer, Inc.*, 281 F.3d 605, 611 (6th Cir. 2002) (applying the *Ercegovich* approach to a Title VII claim) (quoting *McDonald v. Santa Fe Transp. Co.*, 427 U.S. 273, 283 n.11, 96 S. Ct. 2574, 49 L. Ed. 2d 493 (1976)). In this case, there is such a wide gulf between a teacher wearing a rainbow pin or cross pendant to school and Cahall providing third-grade children with unapproved reading materials, that Cahall's comparator allegations cannot cross the plausibility threshold. Cahall's equal protection claim must be dismissed as a matter of law.

**F. The Board Policy is one of General Application (4th Claim for Relief).**

In her fourth claim for relief, Cahall alleges Superintendent Miller suspended her for expressing religious views in violation of the First Amendment. It remains unclear what religious views Cahall was expressing or how she was expressing them by sneaking unapproved books into her classroom library. Cahall does not allege the books were religious. She does not allege she placed the books in her library to symbolically say anything religious. Rather, she alleges she included the books to make LGBTQ students feel safe and included. Cahall does not allege she

used the books in a religious manner in her classroom. Unlike the teacher who wanted to put the bible on his desk, the teacher who sought to teach creationism, the coach who said prayers on the football field, or even the teachers who sought to avoid calling students by their preferred pronouns due to their religious beliefs, Cahall's conduct in this case does not appear to have any religious connotations and does not fit within any religious communication precedent.

The Establishment Clause, as it is called, provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." U.S. Const. amend. I. As discussed above, a teacher has no First Amendment right as it pertains to the selection of classroom materials for students. Indeed, it is well-settled that a teacher's selection of religious classroom materials for students would violate the student's rights under the Establishment Clause violation. See, e.g., *Marchi v. Bd. of Cooperative Educational Services of Albany*, 173 F.3d 469, 475 (2d Cir. 1999).

"When a citizen enters government service, the citizen by necessity must accept certain limitations on his or her freedom." *Garcetti v. Ceballos*, 547 U.S. 410, 418, 126 S. Ct. 1951, 164 L. Ed. 2d 689 (2006) (citation omitted). While "[t]he [Supreme] Court has made clear that public employees do not surrender all their First Amendment rights by reason of their employment," those rights are generally limited to the right to speak as a citizen addressing matters of public concern. *Id.* at 417 (collecting cases). When speaking as an employee for the employer, there is no First Amendment protection. *Evans-Marshall*, 624 F.3d 332, 342 (6th Cir.2010). There can be no reasonable dispute that Cahall was acting in her capacity as a teacher when she selected reading materials for her students. **The determination of whether a public employee's speech is constitutionally protected is a question of law**. *E.g., Kubiak v. City of Chicago*, 810 F.3d 476, 481 (7th Cir. 2016).

"[N]o Free Exercise Clause violation results where a burden on religious exercise is the incidental effect of a neutral, generally applicable, and otherwise valid regulation, in which case such regulation need not be justified by a compelling governmental interest." *Vision Church v. Vill. of Long Grove*, 468 F.3d 975, 998 (7th Cir. 2006) (quoting Civil Liberties for Urban Believers v. City of Chicago, 342 F.3d 752, 763 (7th Cir. 2003)) (internal quotations omitted); see also *Employment Div., Dep't of Human Res. of Oregon v. Smith*, 494 U.S. 872, 879, 110 S. Ct. 1595, 108 L. Ed. 2d 876 (1990) ("[T]he right of free exercise does not relieve an individual of the obligation to comply with a 'valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct that his religion prescribes (or proscribes).'") (citation omitted).

In this case, there is no allegation in Cahall's complaint that the board's policy requiring prior approval of controversial materials is explicitly directed at a religious practice. There is no allegation in the plaintiff's complaint that the board policy prohibits religious conduct while permitting secular conduct. Indeed, this case does not even involve religious materials. Rather, it involves four books with sexuality content, wholly secular in nature, that Cahall made available to her third-grade math and science students to read at their leisure. The Court must conclude that the policy challenged by the plaintiff is neutral and generally applicable, because it applies equally to religious and non-religious teachers who intend to use controversial materials in their classroom.

Where a policy is neutral and generally applicable, the Court will apply a rational-basis review of the validity of such policies. "Right or wrong, rational-basis review epitomizes a light judicial touch." *Tiwari v. Friedlander*, 26 F.4th 355, 361 (6th Cir. 2022) (first citing *FCC v. Beach Commc'ns, Inc*., 508 U.S. 307, 313-14, 113 S. Ct. 2096, 124 L. Ed. 2d 211 (1993). This review is satisfied if "the regulation bear[s] some rational relation to a legitimate state interest[,]"

15

*Craigmiles v. Giles*, 312 F.3d 220, 223 (6th Cir. 2002) (citations omitted), and the Court's inquiry "does not assess the wisdom of the challenged regulation." *Theile v. Mich.*, 891 F.3d 240, 244 (6th Cir. 2018) (quoting *Breck v. Michigan*, 203 F.3d 392, 395 (6th Cir. 2000)).

"[A] plaintiff may demonstrate that the government action lacks a rational basis either by negativing every conceivable basis which might support the government action, or by demonstrating that the challenged government action was motivated by animus or ill-will." *Davis v. Prison Health Servs.*, 679 F.3d 433, 438 (6th Cir. 2012)(quoting *Scarborough v. Morgan Cnty. Bd. of Educ.*, 470 F.3d 250, 260 (6th Cir. 2006)). In this case, the policy requiring teachers to have controversial materials approved before use in the classroom is rational on its face. The board of education is legally responsible for the materials used by its teachers as a matter of law. The Board clearly has a legitimate interest in regulating materials that could be unsafe for students, beyond their maturity levels, or otherwise inappropriate.

Moreover, the plaintiff failed to explain how Superintendent Miller discriminatorily applied the policy to her. There is no dispute that Cahall was aware that LGBTQ+ issues were considered controversial in the district. There is no dispute that she did not seek prior approval before placing the books in her classroom library for students. There is no allegation of other teachers who took similar actions but were not disciplined. As such, there is no plausible claim that Defendant Miller somehow forced or precluded Cahall from engaging in protected religion-based conduct. Cahall's First Amendment claim must be dismissed as a matter of law.

### G. Defendant Miller is Entitled to Qualified Immunity.

In counts two, three and four of her complaint, Cahall has sued Superintendent Miller in his individual capacity for alleged violations of her constitutional rights, including the right to due process, equal protection, and religious freedom. As explained above, there was no constitutional

violation in this case as a matter of law. However, even if there were, Cahall cannot establish that the law surrounding said violations was clearly established by existing precedent sufficient to overcome Superintendent Miller's right to qualified immunity.

"Qualified immunity shields government officials from civil [individual] liability in the performance of their duties so long 'as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Getz v. Swoap*, 833 F.3d 646, 652 (6th Cir. 2016) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982)). The purpose of qualified immunity "is not only protection from civil damages but protection from the rigors of litigation itself, including the potential disruptiveness of discovery." *Summers v. Leis*, 368 F.3d 881, 886 (6th Cir. 2004) (citations omitted).

The Sixth Circuit undertakes a three-step analysis to determine whether an official is entitled to immunity:

> First, we determine whether, based upon the applicable law, the facts viewed in the light most favorable to the plaintiffs show that a constitutional violation has occurred. Second, we consider whether the violation involved a clearly established constitutional right of which a reasonable person would have known. Third, we determine whether the plaintiff has offered sufficient evidence to indicate that what the official allegedly did was objectively unreasonable in light of the clearly established constitutional rights.

*Id*. at 901. See *Pearson v. Callahan*, 555 U.S. 223, 129 S. Ct. 808, 818, 172 L. Ed. 2d 565 (2009) (finding that "[t]he judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand").

With regard to the second step, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness

must be apparent." *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S. Ct. 3034, 97 L. Ed. 2d 523 (1987) (citations omitted). See *Walton v. City of Southfield*, 995 F.2d 1331, 1336 (6th Cir. 1993) ("In determining whether a constitutional right is clearly established, the court must first look to decisions of the U.S. Supreme Court, then to decisions of the Sixth Circuit, and, finally to decisions of other circuits."). "This standard requires the courts to examine the asserted right at a relatively high level of specificity," and "on a fact-specific, case-by-case basis." *Cope v. Heltsley*, 128 F.3d 452, 458-59 (6th Cir. 1997).

In this case, the plaintiff will be unable to point to any existing legal precedent that would have clearly precluded a school superintendent from issuing minor discipline to a teacher who decided to incorporate books with sexuality content into her third-grade classroom library. Therefore, the Court must find that Superintendent Miller is entitled to qualified immunity as a matter of law.

### H. State Law Claims

Finally, Cahall alleges that Superintendent Miller should be held civilly liability for the criminal interference with civil rights under Ohio law. This claim fails for all the reasons set forth above. In addition, the state law claims against the superintendent are precluded by R.C. 2744.03(A)(6).

### IV. CONCLUSION

For the reasons set forth herein, the Court should dismiss the plaintiff's claims against all defendants as a matter of law and with prejudice.

Respectfully submitted:

/s/ Tabitha Justice
Brian L. Wildermuth (0066303), Trial Counsel
bwildermuth@swjohiolaw.com
Tabitha Justice (0075440), Trial Co-Counsel
tjustice@swohiolaw.com
SUBASHI, WILDERMUTH & JUSTICE
The Greene Town Center
50 Chestnut Street, Suite 230
Dayton, OH 45440
(937) 427-8800
(937) 427-8816 (fax)
*Counsel for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on February 20, 2025, I electronically filed the foregoing with the Clerk of the Court using the Court's authorized electronic filing system, which will send notification of such filing to the following:

Mark P. Herron (0051998)
herronlaw@msn.com
5001 Mayfield Road, Suite 212
Lyndhurst, Ohio 44124
*Attorney for Plaintiff*

/s/ Tabitha Justice
Tabitha Justice (0075440)

19