IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| KAREN CAHALL | ) | CASE NO. 1:24-CV-688 |
| | ) | |
| Plaintiff, | ) | JUDGE DOUGLAS R. COLE |
| | ) | |
| v. | ) | |
| | ) | |
| NEW RICHMOND EXEMPTED | ) | |
| VILLAGE SCHOOL DISTRICT | ) | |
| BOARD OF EDUCATION, et al., | ) | |
| | ) | |
| Defendants | ) | |

## BRIEF IN OPPOSITION TO MOTION FOR JUDGMENT ON THE PLEADINGS; CROSS-MOTION FOR PARTIAL JUDGMENT ON THE PLEADINGS

Now comes plaintiff Karen Cahall, by and through counsel, and requests that this Honorable Court deny the defendants' Motion for Judgment on the Pleadings (ECF No. 12) for the reasons set forth herein. Additionally, plaintiff cross-moves this Honorable Court for partial judgment on the pleadings, as to liability only, on her First Claim for Relief and asks that this Court declare New Richmond Board Policy 2240 unconstitutional on its face.

Respectfully Submitted,

s/ *Mark P. Herron*
Mark P. Herron (0051998)
5001 Mayfield Road, Suite 212
Lyndhurst, Ohio  44124
(216) 280-2828
Email:  herronlaw@msn.com

Attorney for Plaintiff

i

## <u>CERTIFICATE OF SERVICE</u>

A copy of the foregoing was sent through the Court's ECF system this 20th day of March, 2025, to:

        Tabitha Justice, Esq.
        Subashi, Wildermuth & Justice
        The Greene Town Center, Suite 230
        Dayton, Ohio  45440

        Attorney for Defendants


                                *s/ Mark P. Herron*
                                Mark P. Herron (0051998)
                                5001 Mayfield Road, Suite 212
                                Lyndhurst, Ohio  44124
                                (216) 280-2828
                                Email:  herronlaw@msn.com

                                Attorney for Plaintiff

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES.................................................................................................... iv

SUMMARY OF ARGUMENT.................................................................................................1

STANDARD OF REVIEW .....................................................................................................1

STATEMENT OF FACTS .......................................................................................................2

ARGUMENT AND LAW ........................................................................................................5

I.    Board Policy 2240 Is Facially Void For Vagueness Under The Substantive Due
      Process Clause Of The Fourteenth Amendment .................................................................5

      A.    The Void For Vagueness Standard ........................................................................5

      B.    Recent Decisions Applying The Void For Vagueness Standard To Similar
            Education Policies...................................................................................................9

      C.    Application Of The Void For Vagueness Standard To Board Policy 2240 ...........14

II.   Plaintiff States A Claim That Board Policy 2240 Violated Plaintiff's Right To Due
      Process As Applied To Her ...............................................................................................21

III.  Plaintiff States A Claim That Defendants Violated Plaintiff's Right to Equal
      Protection ..........................................................................................................................22

IV.   Plaintiff States A Claim That Defendants Violated Plaintiff's Rights Under the Free
      Exercise and Establishment Clauses of the First Amendment...........................................27

V.    Defendant Miller Is Not Entitled To Qualified Immunity .................................................31

VI.   Plaintiff States A Claim For Relief Under R.C. 2307.67 ..................................................34

VII.  Dismissal Of The Official Capacity Claims Is Not Mandated...........................................35

CONCLUSION.....................................................................................................................35

## __TABLE OF AUTHORITIES__

## __CASES__

*Austin v. Redford Township. Police Department,*
    690 F.3rd 490 (6th Cir. 2012)....................................................................31

*Baggett v. Bullit,*
    377 U.S. 360 (1964).............................................................................9

*Belle Maer Harbor v. Charter Township of Harrison,*
    170 F.3rd 553 (6th Cir. 1999)...............................................................8-9

*Black Emergency Response Team v. Drummond,*
    737 F.Supp. 3rd 1136 (W.D. Ok. 2024) (Drummond I) ................................. 13-14

*Black Emergency Response Team v. Drummond,*
    737 F.Supp. 3rd 1158 (W.D. Ok. 2024) (Drummond II)............................... 13-14

*Boutilier v. INS,*
    387 U.S. 118 (1967)............................................................................7

*Brown  v. Lewis,*
    779 F.3rd 401 (6th Cir. 2015)............................................................ 31-32

*Buckle Up Festival, LLC v. City of Cincinnati,*
    336 F.Supp.3rd 882 (S.D. Ohio 2018) ......................................................15

*Church of Lukumi Babalu Aye, Inc. v. City of Hialeah,*
    508 U.S. 520 (1993)........................................................................22, 24

*Clayton v. Meijer, Inc.*
    281 F.3rd 605 (6th Cir. 2002)................................................................27

*Cline v. Frank Dairy Co.,*
    274 U.S. 445 (1927)............................................................................8

*Columbia Natural Resources v. Tatum,*
    58 F.3rd 1101 (6th Cir. 1995) ................................................................8

*Comstock v. McCrary,*
    273 F.3rd 693 (6th Cir. 2001)................................................................32

*Connally v. General Construction Company,*
    269 U.S. 385 (1925)............................................................................7

*Cook v. Gwinnett County School District*,
    424 F.3rd 1313 (11th Cir. 2005) ........................................................................26

*Cruz v. Beto*,
    405 U.S. 319 (1972) ........................................................................................24

*Cummings v. City of Akron*,
    418 F.3rd 676 (6th Cir. 2005) ...........................................................................32

*Dambrot v. Central Michigan University*,
    55 F.3rd 1177 (6th Cir. 1995) .............................................................................6

*Doe v. Springboro Community City School District Board of Education*,
    Case No. 1:19-CV-785 (S.D. Ohio April 15, 2021) ........................................35

*Eagle Express, Inc. v. Paycor, Inc.*,
    732 F.Supp.3rd 753 (S.D. Ohio. 2024) .............................................................2

*Epperson v. Arkansas*,
    393 U.S. 97 (1968) ............................................................................................7

*Ercegovich v. Goodyear Tire & Rubber Co.*,
    154 F.3rd 344 (6th Cir. 1998) ...................................................................... 27-28

*Evans-Marshall v. Board of Education of the Tipp City Exempted Village School District*,
    624 F.3rd 332 (6th Cir. 2010) ...................................................................... 19-20

*Fulton v. Philadelphia*,
    593 U.S. 522 (2021) ........................................................................................28

*Goodwin v. City of Painesville*,
    781 F.3rd 314 (6th Cir. 2015) ...........................................................................31

*Grayned v. City of Rockford*,
    408 U.S. 104 (1972) ..........................................................................................6

*Kennedy v. Bremerton School District*,
    597 U.S. 507 (2022) .................................................................................... 27-28

*Kentucky v. Graham*,
    473 U.S. 159 (1985) ........................................................................................35

*Kolender v. Lawson*,
    462 U.S. 352 (1983) ..........................................................................................8

*Lanzetta v. New Jersey,*
    306 U.S. 451 (1939) .................................................................6

*Local 8027, AFL-CIO v. Edelblut,*
    651 F.Supp.3rd 444 (D. N.H. 2023) (Edelblut I) ..................................... 5, 11-14, 16-17, 21

*Local 8027, AFL-CIO v. Edelblut,*
    Case No. 21-CV-1077 (D. N.H. May 28, 2024) (Edelblut II) ...........................................13

*Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Commission,*
    584 U.S. 617 (2018)........................................................................ 24-27, 31, 33

*Meriwether v. Hartop,*
    992 F.3rd 392 (6th Cir. 2021)........................................................ 2, 24, 29-31, 33

*Miller v. City of Cincinnati,*
    622 F.3rd 524 (6th Cir. 2010)........................................................................7

*Murphy v. Sofamor Danek Group, Inc.,*
    123 F.3rd 394 (6th Cir. 1997)........................................................................2

*NAACP v. Button,*
    371 U.S. 415 (1963)................................................................................8

*Niemotko v. Maryland,*
    340 U.S. 268 (1951)............................................................................ 25-26

*Papachristou v. City of Jacksonville,*
    405 U.S. 156 (1972)................................................................................6

*Roth v. City of Canton,*
    347 F.Supp. 3rd 346 (N.D. Ohio 2018) .............................................................8

*Sample v. Bailey,*
    409 F.3rd 689 (6th Cir. 2005)......................................................................31

*Sampson v., Cuyahoga Metropolitan Housing Authority,*
    131 Ohio St. 3rd 418 (2012) ......................................................................34

*Sequoyah v. Tennessee Valley Authority,*
    620 F.2nd 1159 (6th Cir. 1980) ....................................................................23

*Sessions v. Dimaya,*
    584 U.S. 1348 (2018)............................................................................6, 9

*Sheetz, Inc. v. City of Centerville*,
    Case No. 3:24-CV-59 (S.D. Ohio Aug. 22, 2024) .............................................2

*Shuti v. Lynch*,
    828 F.3rd 440 (6th Cir. 2016).............................................................................7

*Smith v. Gogeun*,
    415 U.S. 566 (1974).............................................................................................8

*Sturgill v. American Red Cross*,
    114 F.4th 803 (6th Cir. 2024) ..................................................................... 22-23

*Tennessee Educational Association v. Reynolds*,
    732 F.Supp. 3rd 783 (M.D. Tenn. 2024) .......................................6, 9-11, 14-15, 17, 21-22

*Total Benefits Planning Agency, Inc. v. Anthem Blue Cross & Blue Shield*,
    552 F.3rd 430 (6th Cir. 2008)............................................................................2

*United Food & Commercial Workers Union, Local 1009 v. Southwest Ohio Regional Transit Authority*,
    163 F.3rd 341 (6th Cir. 1998)......................................................................7, 33

*United States v. Davis*,
    588 U.S. 445 (2019).............................................................................................6

*Updike v. Jonas*,
    700 F.Supp. 3rd 597 (S.D. Ohio 2023) .............................................................35

*Village of Hoffman Estates v. Flipside, Village of Hoffman Estates*,
    530 U.S. 489 (1982)................................................................................... 8-9, 15

*Wheeler v. City of Lansing*,
    660 F.3rd 921 (6th Cir. 2011).............................................................................31

*Ziegler v. IBP Hog Market*,
    249 F.3rd 509 (6th Cir. 2001).............................................................................1

## SUMMARY OF ARGUMENT

The Due Process Clause of the Fourteenth Amendment mandates that a regulation provide fair notice of the standard of conduct to which a citizen is held accountable and that it not leave the definition of its operative terms to those in charge of enforcement, thus inviting arbitrary, discriminatory and overzealous enforcement. New Richmond Board Policy 2240 violates these fundamental requirements by failing to meaningfully define what constitutes a "controversial issue" or an "instructional program." Ms. Cahall's due process rights were further violated when New Richmond used the equally-undefined "values of the community" as the basis for discipling her for allegedly violating Board Policy 2240.

Ms. Cahall further pleads valid claims for violation of her First and Fourteenth rights under the Establishment Clause, the Free-Exercise Clause and the Equal Protection Clause. Ms. Cahall's religious beliefs outlined in the complaint are sincerely held and it is not the role of New Richmond or the courts to question the legitimacy or content of her beliefs. Ms. Cahall has further plead that New Richmond has allowed other staff and teachers to engage in and promote religious activity on school premises and/or using New Richmond resources, in violation of the First and Fourteenth Amendments.

## STANDARD OF REVIEW

A motion for judgment on the pleadings may be made "[a]fter the pleadings are closed but within such time as not to delay the trial." Fed. R. Civ. P. 12(c). A motion for judgment on the pleadings under Rule 12(c) attacks the sufficiency of the pleadings and is reviewed under the same standard applicable to a motion to dismiss under Rule 12(b)(6). See *Ziegler v. IBP Hog Market*, 249 F.3rd 509, 511-12 (6th Cir. 2001). Dismissal may not be granted unless "it appears ***beyond***

**_doubt_** that the plaintiff can prove no set of facts in support of [her] claim which would entitle [her] to relief." *Meriwether v. Hartop*, 992 F.3rd 392, 498 (6th Cir. 2021).

Consequently, this Court must construe the complaint in the light most favorable to Ms. Cahall, accept all factual allegations as true, and make all reasonable inferences in favor of Ms. Cahall. See *Total Benefits Planning Agency, Inc. v. Anthem Blue Cross & Blue Shield*, 552 F.3rd 430, 434 (6th Cir. 2008); *Murphy v. Sofamor Danek Group, Inc.*, 123 F.3rd 394, 400 (6th Cir. 1997); *Eagle Express, Inc. v. Paycor, Inc.*, 732 F.Supp.3rd 753, 759 (S.D. Ohio. 2024). While a Court may consider matters of public record and exhibits attached to a complaint in resolving a motion to dismiss, a Court generally may not rely on matters outside of the complaint or engage in fact-finding at the motion to dismiss stage. *Eagle Express*, 732 F.Supp.3rd at 759. In fact, courts will routinely deny motion to dismiss where the arguments advanced are better addressed in the context of a summary judgment motion once a proper factual record has been developed through discovery. See, e.g., *Sheetz, Inc. v. City of Centerville*, Case No. 3:24-CV-59 (S.D. Ohio Aug. 22, 2024).

Defendants cannot meet this very high bar. The well-plead allegations set forth in the complaint establish viable claims for violations of Ms. Cahall's rights under the First Amendment's Establishment clause as well as the Fourteenth Amendment's Substantive Due Process and Equal Protection clauses. The defendants' principal arguments also fail to the extent that many of them largely depend upon factual assumptions that are not within the four corners of the complaint and improperly invite this Court to engage in fact finding that is impermissible at the pleading stage. Accordingly, the motion for judgment on the pleadings should be denied.

## STATEMENT OF FACTS

Consistent with the standards set forth above, the following facts alleged in the Complaint must be accepted **_as true_** for purposes of defendants' motion:

- The New Richmond Exempted Village School District ("New Richmond") is a public school district located in Clermont County, Ohio, and is governed by an elected Board of Education (ECF No. 1, *Complaint*, ¶ 4, Page ID No. 3);

- Defendant Tracey Miller served as Superintendent for New Richmond during the time period relevant to this case (ECF No. 1, *Complaint*, ¶ 6, Page ID No. 4);

- New Richmond had in effect during all times relevant to this case a "controversial issues" policy referred to as Board Policy 2240 – the contents of which are attached to the Complaint and speak for themselves (ECF No. 1, *Complaint*, ¶ 10, 19-26, Complaint Exhibit 1, Page ID Nos. 4, 6-8, 27-28);

- The plain language of Board Policy 2240 permits students to initiate the discussion of "controversial issues" and further allows a teacher to express a personal opinion on the issue provided it is identified as such and is not done so for the purpose of persuading a student to the teacher's personal view;

- Plaintiff Karen Cahall has taught for the New Richmond Exempted Village School District for over 30 years and has received excellent evaluations for her job performance and teaching (ECF No. 1, *Complaint*, ¶ 4, 34-35, Page ID Nos. 3, 9-10);

- Ms. Cahall has sincerely-held moral and religious beliefs that all children, including children who are LQBTQ+ or the children of parents who are LGBTQ+, deserve to be respected, accepted and loved for who they are (ECF No. 1, *Complaint*, ¶ 12, 37, 48-49, Page ID Nos. 5, 10-12);

- Throughout the course of her employment with New Richmond, Ms. Cahall has maintained numerous books in her classroom on a wide variety of topics and subject matters that students are free to review or read (or not review or read) during their free time (ECF No. 1, *Complaint*, ¶ 42, Page ID No. 11);

- The books maintained by Ms. Cahall are kept in large bins in her classroom and are not prominently displayed in her classroom; to ascertain the title or subject manner of any particular book one must physically go through the bins and individually review each book (ECF No. 1, *Complaint*, ¶ 43, Page ID No. 11);

- Four of the books that Ms. Cahall maintained in her classroom in the bins with all of the other books had characters in them that identify as LGBTQ+.  None of the four books advocated for or against any particular lifestyle; none were obscene, and none described sexual contact or activity (ECF No. 1, *Complaint*, ¶ 44-47, Page ID No. 11);

- Ms. Cahall did not prominently display these specific books in her classroom, did not teach from these books as part of her instructional program, and did not require students to read from these books (ECF No. 1, *Complaint*, ¶10, 60, Page ID Nos. 4-5, 14);

3

- Ms. Cahall had originally obtained the four disputed books following a dispute in the New Richmond district in 2020-2021 over whether teachers should be permitted to display "rainbow stickers" on their nametags, laptop cases or desk nameplates, to show that they were safe for LGBTQ+ students to confide in or seek advice from (ECF No. 1, *Complaint*, ¶ 27-33, Page ID Nos. 8-9);

- Ms. Cahall obtained the books after her personal research revealed that, compared to their peers, a statistically higher percentage of LGBTQ+ youth had reported symptoms of anxiety, depression, had considered suicide, experienced difficulty and had experienced delay in obtaining mental health care due to anti-LGBTQ+ stigma, family and peer rejection and discrimination (ECF No. 1, *Complaint*, ¶ 38-40, Page ID No. 10);

- After learning about these specific books, Ms. Cahall viewed them as reinforcing her sincerely moral and religious beliefs that all children, including children who are LGBTQ+ of the children of LGBTQ+ parents, deserve to be respected, accepted and loved for who they are, felt that the books could serve as a positive tool to promote those values to any LGBTQ+ student who might come to her for guidance or support and included them in her classroom library (ECF No. 1, *Complaint*, ¶ 48-49, Page ID Nos. 12-13);

- During Ms. Cahall's employment with New Richmond, the District has allowed its teachers and employees to wear religious insignia and symbols in the presence of other students and has allowed teachers to use District-maintained resources, such as District email accounts, to promote religious-based events such as a prayer service in Ms. Cahall's school building prior to the start of the school year called "Blessing of Monroe" and an activity known as "Samaritan's Purse" that distributed items to children on over 170 countries along with a Bible storybook translated into the language of the child receiving it (ECF No. 1, *Complaint*, ¶ 50-53, Page ID Nos. 12-13);

- On or about October 30, 024, Kayla Shaw, whose child is a student in Ms. Cahall's class, made an email complaint to New Richmond regarding the presence of the disputed books in Ms. Cahall's classroom (ECF No. 1, *Complaint*, ¶ 55-56, Page ID No. 13);

- Upon receipt of Ms. Shaw's complaint, defendant Miller directed Ms. Cahall to appear for a pre-disciplinary hearing on November 4, 2024, regarding the books (ECF No. 1, *Complaint*, ¶ 57, Page ID No. 13);

- Ms. Cahall complied with the directive to appear at the pre-disciplinary hearing and at that hearing explained her reasons for maintaining the disputed books in her classroom library, including her sincerely held religious beliefs for doing so (ECF No. 1, *Complaint*, ¶ 58-60, Page ID No. 14);

- On November 6, 2024, defendant Miller suspended Ms. Cahall for three days without pay for having the disputed books in her classroom. The written suspension notice is attached to the complaint and its contents speak for itself (ECF No. 1, *Complaint*, ¶ 61, Complaint Exhibit 2, Page ID No. 14, 29-30);

- Although the suspension notice speaks for itself, defendant Miller made no findings that Ms. Cahall used the disputed books as part of her instructional program, that she initiated discussion regarding the books with any students, that she used the books to indoctrinate students or endorse an LGBTQ+ lifestyle, or that she prominently displayed the books in her classroom (ECF No. 1, *Complaint*, ¶ 62-63, Page ID No. 14); and

- The suspension notice explicitly threatened Ms. Cahall with further discipline, including termination, for any further alleged violations of Board Policy 2240 (ECF No. 1, *Complaint*, ¶ 61, *Complaint* Exhibit 2, Page ID Nos. 29-30).

These well-plead allegations, which must be taken as true with all reasonable inferences from them to be drawn in Ms. Cahall's favor, are sufficient to state claims for relief.

## LAW AND ARGUMENT

## I. **Board Policy 2240 Is Facially Void For Vagueness Under The Substantive Due Process Clause Of The Fourteenth Amendment**

In her First Claim for Relief, Ms. Cahall alleges that Board Policy 2240 is unconstitutional on its face under the Fourteenth Amendment's guarantee of due process of law. Ms. Cahall contends that Board Policy 2240 does not pass constitutional muster because the terms "controversial issue" and "instructional program" are impermissibly vague (ECF No. 1, *Complaint*, ¶ 68-72, Page ID Nos. 16-17) and accordingly requests that this Court declare Board Policy 2240 to be unconstitutional on its face. As this claim is a ***facial*** challenge to the constitutionality of Board Policy 2240, the only evidence that needs to be considered is the language of the policy itself. See *Local 8027, AFL-CIO v. Edelblut*, 651 F.Supp.3[rd] 444, 454 (D. N.H. 2023).

### A. The Void for Vagueness Standard

Contrary to what the defendants suggest, resolution of this facial challenge to Board Policy 2240 has nothing to do with the right of a public school district to set its curriculum. While public school districts have the right to determine what is and what is not taught in their schools by their teachers, ***how*** they communicate to their teachers what can or cannot be taught is constrained by

the Fourteenth Amendment's Due Process Clause. "Living under a rule of law entails various suppositions, one of which is that '[all persons] are entitled to be informed as to what the State commands or forbids.'" *Papachristou v. City of Jacksonville*, 405 U.S. 156, 162 (1972) (quoting *Lanzetta v. New Jersey*, 306 U.S. 451, 452 (1939)). Those subject to a law must be able to understand it so that they may conform with it, and a law that cannot be understood is no law at all. *United States v. Davis*, 588 U.S. 445, 447 (2019); *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972).

Citizens are entitled to laws that are of sufficient clarity that they leave no room for arbitrary or discriminatory enforcement by judges, law enforcement or other officials (including Superintendents of public-school districts). See *Sessions v. Dimaya*, 584 U.S. 1348, 1375 (2018) (Gorsuch, J., concurring in part). Justice Gorsuch aptly observed in his concurrence in *Dimaya* that vague laws "can invite the exercise of arbitrary power . . . by leaving people in the dark about what the law demands and allowing prosecutors and courts to make it up."

The Sixth Circuit has stated:

Vagueness may take two forms, both of which result in a denial of due process. A vague ordinance denies fair notice of the standard of conduct to which a citizen is held accountable. At the same time an ordinance is void for vagueness if it is an unrestricted delegation of power, which in practice leaves the definition of its terms to law enforcement officers, and thereby invites arbitrary, discriminatory and overzealous enforcement.

*Dambrot v. Central Michigan University*, 55 F.3rd 1177, 1183-1184 (6th Cir. 1995). Accord *Tennessee Educational Association v. Reynolds*, 732 F.Supp.3rd 783, 806 (M.D. Tenn. 2024); *Buckle Up Festival, LLC v. City of Cincinnati*, 336 F.Supp.3rd 882, 886 (S.D. Ohio 2018).

The Sixth Circuit has further stated:

In pursuing a void-for-vagueness claim, a plaintiff must establish to a court's satisfaction that "[a regulation's] prohibitive terms are not clearly defined such that a person of ordinary intelligence can readily identify the applicable standard for

> inclusion and exclusion." *** The void-for-vagueness doctrine not only ensures that laws provide "fair warning" of proscribed conduct, but it also protects citizens against the impermissible delegation of basic policy matters "for resolution on an *ad hoc* and subjective basis, with the attendant dangers of arbitrary and discriminatory application." *** Without "clear standards guiding the discretion of public officials" with enforcement authority, there is a risk that those officials will "administer the policy based on impermissible factors." *** As a result, laws or regulations that, for example, give officials "unbridled discretion over a forum's use" are impermissible because of the "danger of censorship and of abridgement of our precious First Amendment freedoms." *** A statute that fails to constrain "an official's decision to limit speech" with "objective criteria" is unconstitutionally vague.

*Miller v. City of Cincinnati*, 622 F.3rd 524, 539 (6th Cir. 2010) (citations omitted).

The constitutional prohibition against vague laws applies in the civil context as well as the criminal context. See, e.g., *Boutilier v. INS*, 387 U.S. 118, 123 (1967); *Shuti v. Lynch*, 828 F.3rd 440, 445 (6th Cir. 2016). The constitutional prohibition against vagueness also applies in the educational context and restrictions on what teachers can and cannot teach in their classrooms. See, e.g., *Epperson v. Arkansas*, 393 U.S. 97, 102-103 (1968) (observing that the "infinite varieties of communication embraced within the term 'teaching'" can render the term vague).

The Sixth Circuit has cautioned that use of the term "controversial" to define what is or is not permissible "vests the decision-maker with an impermissible degree of discretion." *United Food & Commercial Workers Union, Local 1009 v. Southwest Ohio Regional Transit Authority*, 163 F.3rd 341, 359 (6th Cir. 1998). In this regard, the Sixth Circuit has recognized a crucial distinction between the notice requirements and the necessary enforcement constraints and has stated that the latter is perhaps of even more importance than the former:

> The requirement that the government write statutes that provide fair notice to those who must obey them is a traditional basis of the vagueness doctrine. "A statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application, violates the first essential of due process of law." *Connally v. General Constr. Co.*, 269 U.S. 385, 391 (1925). The requirement of fair notice is not applied

7

mechanically or without regard for the common sense judgment that people do not review copies of every law passed.

The second concern, that of minimal enforcement standards, is related to the first. While the first involves notice to those charged with obeying the law, the second part relates to notice to those who must enforce the law, be they the police, judges, or juries. The standards of enforcement must be precise enough to avoid "involving so many factors of varying effect that neither the person to decide in advance nor the jury after the fact can safely and certainly judge the result." *Cline v. Frink Dairy Co.*, 274 U.S. 445, 465 (1927).

As a practical matter, the Supreme Court considers the latter concern the most important. This reflects the common sense understanding that the average citizen does not read, at his leisure, every federal, state, and local statute to which he is subject. *See, e.g.*, *Kolender v. Lawson*, 461 U.S. 352, 357 (1983) ("Although the doctrine focuses both on actual notice to citizens and arbitrary enforcement, we have recognized recently that the more important aspect of vagueness doctrine 'is not actual notice, but the other principal element of the doctrine -- the requirement that a legislature establish minimal guidelines to govern law enforcement.'") (quoting *Smith v. Goguen*, 415 U.S. 566, 574 (1974)).

*Columbia Natural Resources v. Tatum*, 58 F.3rd 1101, 1105 (6th Cir. 1995). See also *Roth v. City of Canton*, 347 F.Supp. 3rd 346, 356-357 (N.D. Ohio 2018).

The level of scrutiny to be applied to a particular enactment is also dependent upon whether First Amendment interests are involved.[1] A more stringent vagueness test generally applies to laws abridging the freedom of speech. See, *e.g.*, *Village of Hoffman Estates v. Flipside, Village of Hoffman Estates*, 530 U.S. 489, 499 (1982). See also *NAACP v. Button*, 371 U.S. 415, 432 (1963) ("[S]tandards of permissible statutory vagueness are strict in the area of free expression"). "Where a vague statute 'abuts upon sensitive area of basic First Amendment freedoms' it 'operates to inhibit the exercise of [those] freedoms.'" *Belle Maer Harbor v. Charter Township of Harrison*,

---

[1]     Defendants will contend that Board Policy 1140 applies to instructional programs; accordingly no First Amendment implications are raised in this case and a heightened analysis therefore is not necessary. As further discussed herein, however, Board Policy 2240 specifically allows teachers to express their **_personal_** opinion to a student in a discussion of a controversial issue – provided that the teacher identify it as his or her personal opinion and not express their opinion for the purpose of persuading the student to his or her particular point of view. This allowance clearly abuts on basic First Amendment free speech rights and thus justifies a heightened analysis of Board Policy 2240.

170 F.3rd 553, 556 (6th Cir. 1999) (quoting *Baggett v. Bullit*, 377 U.S. 360, 372 (1964). A heightened scrutiny will also be appropriate where the enactment lacks a scienter requirement, "especially with respect to the adequacy of notice to the complainant that his conduct is proscribed." *Hoffman Estates*, 530 U.S. at 499. Finally, a heightened scrutiny will apply where a civil enactment provides for serious civil sanctions – such as the potential for loss of a professional license and livelihood. See, e.g., *Dimaya*, 584 U.S. at 184-185 (Gorsuch, J., concurring); *Hoffman Estates*, 455 U.S. at 498-499.

**B.** **Recent Decisions Applying The Void For Vagueness Standard To Similar Education Policies**

Several states have enacted legislation in the past few years attempting to limit the consideration of so-called "divisive issues" in public education – both at the college level and in primary and secondary education – that have been met with court challenges. Three cases out of Tennessee, New Hampshire and Oklahoma in particular have addressed issues that closely parallel the issues presented in this case. While these courts have affirmed the right of states and local school districts to set their curriculum, those same courts have also confirmed that these various enactments still must comport with basic due process requirements and have allowed constitutional challenges to them to proceed on the grounds that they are unconstitutionally vague because they fail to adequately define what is or is not prohibited with the required degree of clarity. Collectively, these decisions set a framework for addressing the constitutionality of Board Policy 2240.

In *Tennessee Educational Association v. Reynolds*, 732 F.Supp. 3rd 783 (M.D. Tenn. 2024), the District Court addressed a series of enactments that prohibited public school teachers in Tennessee from "including" or "promoting" certain concepts in the classroom, including that "[Tennessee] or the United States is fundamentally or irredeemably racist or sexist" or the idea of

"ascribing character traits, values, moral or ethical codes, privileges, or beliefs to a race or sex, or to an individual because of the individual's race or sex." Enforcement and implementation rules included in the enactments and in subsequent regulations implemented by the Tennessee Department of Education required investigation of any complaint from a wide array of "eligible complainants" which could lead to a wide variety of penalties, including teacher discipline and/or the withholding of funding from a school system. *Reynolds*, 732 F.Supp. 3rd at 793-799.

The plaintiffs alleged that the enactments and implementing regulations were void for vagueness and therefore violated the Fourteenth Amendment's due process clause. The defendants filed a motion to dismiss, which the District Court denied. After acknowledging the right of the State of Tennessee to regulate the speech of its teachers in the performance of their teaching duties, *Reynolds*, 732 F.Supp. 3rd at 807, n. 15, the District Court explained why the Tennessee statutes were unconstitutionally vague:

> Given that it is possible for an ordinary civil law to be impermissibly vague, the Act — or, at least, a substantial portion of it — obviously poses that risk. Indeed, the defendants have not identified any enforceable prohibitory civil law, in Tennessee or any other U.S. jurisdiction, that is less clear in its directives than the Act. The defendants protest that difficult edge cases may arise under many statutes, and that does not render those statutes necessarily unconstitutional. That is true, but it is beside the point. As the Supreme Court has explained, "[w]hat renders a statute vague is not the possibility that it will sometimes be difficult to determine" whether a violation has occurred, "but rather the indeterminacy of precisely what" standard the law imposes for finding a violation in the first place. ***. The Court has recognized that that danger is particularly strong when a statute uses terms incorporating "wholly subjective judgments without statutory definitions, narrowing context, or settled legal meanings." *** That is exactly what has happened here.

> The Act does not simply use language that is sloppy or overly general; the entire Act is built around unrestrained appeals to abstract principles with contestable moral and political content — such that the practical meaning of the Act must, by definition, depend in significant part on the political, social, and moral assumptions of the party enforcing it. Every or nearly every concept prohibited by the Act is poorly defined in that way, set out in language that might be at home in an angered blog post or an opinion column but which, when imported into a legal code, is

10

> manifestly unworkable. What, for example, does it mean to "promote" the concept that Tennessee or the United States is "fundamentally or irredeemably racist or sexist"? What is the difference between ascribing a trait to a nation/state and ascribing that trait to the nation/state's institutions, leaders, or history? What separates a "fundamental" trait from a non-fundamental one? What does it mean for such a flaw to be "irredeemable"? All of those issues arise before one even reaches the main event: the meaning of the terms "racist" and "sexist." Anyone who lives in the United States should know that one could fill a library with the disagreements about the meaning of those terms that happen in a single day.

*Reynolds*, 732 F.Supp.3rd at 807. The District Court summed it up by aptly stating that "the government cannot simply tell people to 'be good' and leave it up to the enforcers to decide what 'good' is." *Reynolds*, 732 F.Supp. 3rd at 808. The apt analogy to this case is that "the government cannot simply tell a teacher not to say something 'controversial' and then leave it up to the enforcers to decide what 'controversial' is."

A similar challenge was presented in *Local 8027, AFL-CIO v. Edelblut*, 651 F.Supp. 3rd 444 (D. N.H. 2023) ("*Edelblut I*). In *Edelblut*, plaintiffs challenged on multiple grounds a series of enactments in New Hampshire that sought to limit what teachers could teach on "divisive matters." Similar in concept to the Tennessee enactments at issue in *Reynolds*, these enactments stated that primary or secondary students in the state's public schools could not be "taught, instructed, inculcated or compelled to express belief in, or support for" the idea that one is not "inherently superior" to another because of any particular characteristic, that anyone is inherently biased against another because of any particular characteristic, or that anyone should be treated differently because of any particular characteristic. Multiple enforcement mechanisms were also enacted. The New Hampshire Attorney General or any other person "claiming to be aggrieved by a violation" of the prohibitions could seek damages and injunctive relief through the state courts. Violations could also lead to sanctions through the New Hampshire State Board of Education in

the form of suspension or revocation of an educator's certification, as well as a reprimand. *Edelblut I*, 444 F.Supp. 3rd at 447-448.

Several groups challenged the statutes on First Amendment freedom of speech grounds and "void for vagueness" grounds. A Motion to Dismiss was filed. The District Court rejected the teachers' First Amendment claim to the extent that it related to the curricular speech of primary and secondary teachers, *Edelblut*, 444 F.Supp. 3rd at 450-454,[2] but allowed the void for vagueness claim to proceed.

Central to the Court's analysis was the lack of a scienter requirement in the statutory enactment. Even though the statutory enactment fairly described what was considered to be a "divisive concept," the District Court held that because of the absence of a scienter requirement in the statutes, "inadvertent statements that are later deemed to advocate a banned concept can violate the [statutory enactment]." *Edelblut I*, 444 F.Supp. 3rd at 460. The District Court elaborated:

> Defendants argue that they should prevail even under this standard because the education and antidiscrimination amendments provide adequate notice and sufficient enforcement guidelines. I disagree. Although the amendments identify certain core concepts that may not be taught, they do not give either teachers or enforcers the guidance they need to find the line between what the amendments prohibit and what they permit. This is so especially because the amendments allow teachers to be sanctioned for speech that advocates a banned concept only by implication.
>
> In addition to express advocacy, the AG has opined that the amendments can be violated by conduct that merely implies the truthfulness of a banned concept. *** For example, the opinion states that a public employer could violate the amendments if it creates a web-based anti-racist resource and states that it was designed to "serve as a resource for our white employees" *** According to the AG, this conduct could violate the amendments because it "may imply that white people, specifically and for no other reason, are in need of anti-racist resources" ***. In other words, a teacher could unknowingly violate the amendments by making a statement that does not expressly endorse a banned concept but that could be understood to imply it. Coupled with the enforcing agencies' view that the amendments are not limited to curricular speech but also governs teachers' conduct

---

[2]   The District Court allowed the teachers' First Amendment claim to proceed to the extent that the challenged statutes applied to extra-curricular speech ***outside*** of the classroom. *Edelblut I*, 444 F.Supp. 3rd at 453.

> during extracurricular activities, this statutory construction leaves open countless
> applications where a teacher does not directly assert a banned concept but, in the
> view of an enforcer, implies its correctness.

*Edelblut I*, 444 F.Supp. 3rd at 461.  Based on these and other related concerns, the District Court

declined to dismiss the plaintiffs' due process claims.  The District Court reaffirmed its findings

when it granted summary judgment to the plaintiffs and struck down the statutory scheme on due

process grounds, *Local 8027, AFL-CIO v. Edelblut*, Case No. 21-CV-1077 (D. N.H. May 28, 2024)

(*Edelblut II*), concluding that "the Amendments are viewpoint-based restrictions on speech that do

not provide either fair warning to educators or what they prohibit or sufficient standards for law

enforcement to prevent arbitrary and discriminatory enforcement."

A similar conclusion was reached in a challenge to statutory enactments in Oklahoma.  In

a pair of reported decisions, a District Court found that portions of Oklahoma's statute stating that

public K-12 schools and universities shall not "require or make part of a course" certain concepts

related to race or sex violated the Due Process Clause.  *Black Emergency Response Team v.

Drummond*, 737 F.Supp. 3rd 1136 (W.D. Ok. 2024) (*Drummond I*); *Black Emergency Response

Team v. Drummond*, 737 F.Supp. 3rd 1158 (W.D. Ok. 2024) (*Drummond II*).  The District Court

took issue with several provisions of the statute applicable to K-12 public schools.  One provision

that District Court invalidated provided that "no [school personnel] shall *** make part of a course

the *** concept[] *** members of one race or sex cannot and should not attempt to treat others

without respect to race or sex ***."  The Court was concerned that although this particular

provision would prohibit the teaching of ideas that had already been widely rejected (i.e., that it is

acceptable to restrict access to public accommodations based upon race) but would prohibit a

teacher from including in a course ideas that are the subject of current political debate (such as

affirmative action or the consideration of race or gender in college admissions). Based upon this

ambiguity the District Court found that "there is a strong likelihood that Plaintiff will be able to show that [this provision] does not provide fair notice to school administrators and teachers as to what is prohibited *** and what is not and, therefore, [the provision] is impermissibly vague in violation of the Fourteenth Amendment." *Drummond I*, 737 F.Supp. 3rd at 1152.

The District Court also took issue with a provision that stated that "no [school personnel] shall *** make part of a course the *** concept[] *** members of one race or sex cannot and should not attempt to treat others without respect to race or sex ***." The District Court noted that while this provision would prohibit the teaching of ideas that had been widely rejected (such as that children should be judged by the color of their skin and not the content of their character) it too would equally appear to prohibit other ideas that are also the subject of current political debate or reflected in current law (such as whether separate sports divisions should be established for boys and girls). This ambiguity also resulted in the Court determining that it was impermissibly vague. *Drummond I*, 737 F.Supp. 3rd at 1152-1153.

### C.     Application Of The Void For Vagueness Standard To Board Policy 2240

If there is any meaningful distinction between Board Policy 2240 and the policies at issue in *Reynolds*, *Edelblut* and *Drummond*, it is that the drafters of the legislation and policies at issue in those cases at least made an effort to identify with some specificity what concepts could not be taught in the schools in those jurisdictions. While those efforts were insufficient to save the legislation in *Reynolds* and *Edelblut*, it was successful as to some of the enactments at issue in *Drummond* – illustrating the high degree of specificity that is necessary to meet the notice requirements imposed by the due process clause outlined herein.

Board Policy 2240 makes no such effort and is even substantially vaguer than the policies at issue in these cases. There simply is nothing in the plain language of Board Policy 2240 that

14

would place a person of ordinary intelligence on notice as to what is or is not "controversial" or that would guide the individual(s) in charge of enforcing it as to how to do so in a manner that does not invite arbitrary or discriminatory enforcement.

The use of the terms "controversial issues" and "instructional program" to define the scope of Board Policy 2240 fails because these terms do not adequately define what constitutes a "controversial issue" or an "instructional program."  As stated above, the Sixth Circuit has cautioned that use of the term "controversial" to define what is or is not permissible practically invites a void for vagueness determination.  *United Food & Commercial Workers Union, Local 1009*, 163 F.3rd at 359.  Accord *Reynolds*, 732 F.Supp. 3rd at 809.  Board Policy 2240's definition of "controversial issue" as "a topic on which opposing points of view have been promulgated by responsible opinion or likely to arouse both support and opposition in the community" simply fails to provide the required "fair warning" as to what is prohibited and what is not prohibited.  It quite literally can extend to ***anything*** that two people may disagree upon.  A topic that one person or group might consider "controversial" might not be considered "controversial" to another person or group.  Disposition of that dispute can ultimately be left to whether the decision-maker agrees or disagrees with a particular viewpoint.  This simply is not permissible.  Cf. *Reynolds*, 732 F.Supp. 3rd at 807 (act is void for vagueness when "practical meaning *** must, by definition, depend in significant part on the political, social, and moral assumptions of the party enforcing it").  This is ***precisely*** what the term "controversial issue" in Board Policy 2240 invites.

These constitutional infirmities are compounded by the failure of Board Policy 2240 to define what constitutes an "instructional program" that would be subject to the vague "controversial issues" definition.  Read in context, the plain language of Board Policy 2240 does not prohibit the discussion of "controversial issues" in a classroom setting.  Board Policy 2240

expressly acknowledges that "the consideration of controversial issues has a legitimate place in the instructional program of the schools" and states:

> Properly introduced and conducted, the consideration of such issues can help students learn to identify important issues, explore fully and fairly all sides of an issue, weigh carefully the values and factors involved, and develop techniques for formulating and evaluating positions.

Board Policy 2240 also recognizes that discussion of "controversial issues related to the program may be initiated by the students themselves ***." The only express limitation imposed upon teachers in such a situation is that if a teacher expresses his or her personal opinion on a "controversial issue," the teacher "shall identify it as such, and must not express such an opinion for the purpose of persuading students to his/her point of view."

What Board Policy 2240 does ***not*** do is provide any guidance whatsoever on whether simply maintaining a material in a classroom that may touch upon a "controversial issue" constitutes part of the "instructional program" ***even if a teacher never discusses either the material or the subject matter with students in any type of setting (including one initiated by the student)***. This is significant in this case because the Complaint alleges that Ms. Cahall never taught from the disputed books, never required any student to read any of the books and did not prominently display them in her classroom. (ECF No. 1, *Complaint*, ¶10, 43, 60, Page ID Nos. 4-5, 11, 14). These allegations must also be taken as true for purposes of the pending motion. Based upon the plain language of Board Policy 2240, it is reasonable to infer that "instruction" does not extend to merely possessing a particular book or material. Defendants cite no authority to the contrary and provide no reasoning as to why this inference ought not be afforded to Ms. Cahall in the context of resolving a motion for judgment on the pleadings.

There are also significant parallels between this case and *Edelblut* on the issue of scienter. Although defendants will claim that Ms. Cahall knew exactly what she was doing and that the

issue of scienter need not even addressed, that argument misses the point. A New Richmond teacher could bring virtually any book or material into her or her classroom and risk it being determined "controversial" for one subjective reason or another. For example, a teacher could place a book in his or her classroom library that features children of different races or ethnicities who are friends that have bonded over a love of sports. The teacher might view the book as promoting the enjoyment of participating in sports, promoting being a good teammate or promoting good sportsmanship – all certainly values worthy of promotion. However, a parent could complain that the book is "controversial" by somehow implying that children who do not have friends of a different race or ethnicity are inherently racist or that that they need to have friends of other races or ethnicities in order to not be perceived as racist. Would the teacher who puts that book in his or her classroom library be accused of "indoctrination by implication" simply for having the book? What about a book that features a Jewish child who excels at playing the violin and gives an amazing performance at a Hanukkah celebration? Would a teacher who puts that book in his or her classroom be accused of implicitly endorsing Judaism over Christianity? What if the child in the book was a Muslim? What guidelines are in place to ensure that New Richmond does not order the removal of the book as "controversial" in response to a parent complaint based simply upon the subjective religious beliefs of whomever responds to the parent's complaint?

There is nothing in Board Policy 2240 that operates to protect New Richmond teachers from allegations of "indoctrination by implication" that the District Court in *Edelblut* warned about, and nothing to guide those charged with enforcing Board Policy 2240 to do so in a manner that is not arbitrary and/or discriminatory – as *Reynolds* warned about.

The "vagueness" problem goes even further.  Board Policy 2240 expressly permits teachers to express their personal opinion on a controversial issue – an allowance that clearly abuts upon protected First Amendment speech – as long as the teacher expresses it as such and does not do so for the purpose of persuading a student to his or her point of view.  There is no "fine line" or guidance in Board Policy 2240 distinguishing between the permissible expression of a (constitutionally protected) personal opinion and the impermissible persuasion of a student to adopt the teacher's opinion.  For example – suppose that during a discussion about current events a student asks a question about whether the Ten Commandments should be required to be posted in every public school classroom.[3]  Board Policy 2240 would permit the teacher to express his or her opinion on that issue.  Board Policy 2240 allows and encourages them to "explore fully and fairly all sides of an issue [and to] weigh carefully the values and factors involved ***."  Would that teacher be considered endorsing or advocating a particular religious viewpoint if he or she were to say yes and explain why (even if they were clear that it was only their personal opinion)?  Would that teacher be improperly attempting to persuade the student towards an anti-Christian position if the teacher said no and explained why?  Would it make a difference if the teacher volunteered why or why not they had that opinion, or would the student have to first ask the teacher why?  Would it matter if the student expressed his or her own opinion and reasoning, and then sought to engage in a colloquy with the teacher as Board Policy 2240 seemingly encourages?  Is the teacher required to keep quiet while students are allowed to explain their opinions lest they be accused of trying to change the student's mind?  Parents on both sides of that specific issue could approach the District and accuse the teacher of trying to indoctrinate their child to their viewpoint simply because the teacher permissibly expressed a protected personal opinion in response to the

---

[3]     Legislation permitting school districts in Ohio to do exactly that is currently pending in the General Assembly.

child's question that the parent happens to disagree with. What is the teacher supposed to do in that situation? Board Policy 2240 provides no guidance whatsoever. It raises the threat of accusations of "indoctrination by implication" that *Edelblut I* warned about. It raises the concern expressed in *Reynolds* that the disposition of any such allegation could be dependent upon the political, social, and moral assumptions of the party enforcing it.

As noted above, defendants do not cite to any cases reaching a contrary result on language similar to that contained in Board Policy 2240. The only decision they cite to – *Evans-Marshall v. Board of Education of the Tipp City Exempted Village School District*, 624 F.3rd 332 (6th Cir. 2010) – is distinguishable on multiple grounds. First and foremost, *Evans-Marshall* did not involve challenges to any district or school policies on void-for-vagueness due process grounds – either facially or as-applied. For that reason alone, *Evans-Marshall* is not dispositive on the issues presented in this case.

Second, a cursory review of the facts[4] in *Evans-Marshall* shows that – unlike this case – the teacher was actively using the contested materials as a part of her curriculum with her students – assigning specific books to the students to read and discuss in class. *Evans-Marshall*, 624 F.3rd

---

[4]    Defendants in fact have grossly misrepresented the operative facts in *Evans-Marshall*. In an attempt to compare this case to *Evans-Marshall*, defendants **_falsely_** state that "like the plaintiff in this case, [Evans-Marshall] alleged that she did not compel the students to read any particular book" (ECF 12, at 7, Page ID No. 59). The Court's recitation of the facts tells a different story. In outlining the facts, the Court found that "Evans-Marshall assigned Ray Bradbury's *Fahrenheit 451* to her 9th graders." The Court next found that "to the end of exploring the book's theme of government censorship, she distributed a list compiled by the American Library Association of the '100 Most Frequently Challenged Books.' Students divided into groups, and Evans-Marshall asked each group to pick a book from the list, to investigate the reasons why the book was challenged and to lead an in-class debate about the book." The Court further found that "after the class completed the *Fahrenheit 451* unit, Evans-Marshall assigned *Siddhartha* by Hermann Hesse and used it as the basis for in-class discussions about 'spirituality, Buddhism, romantic relationships, personal growth, [and] familial relationships." *Evans-Marshall*, 624 F.3rd at 334-335. Nothing even remotely comparable to that happened in this case. Whereas Evans-Marshall was actively using those books as part of her instructional program and requiring her students to read and discuss the books in class, Ms. Cahall was not. The facts in *Evans-Marshall* also indicate that her behavior continued for some period of time after having been confronted by District officials and told to stop it on more than one occasion – ultimately resulting in the termination of her contract. This is not present in this case as well. There is no justification for this blatant misrepresentation of precedent.

at 334-336. There are no such allegations in this case; indeed the complaint expressly alleges that Ms. Cahall did not actively teach from any of the books at issue or require any student to read any of them (ECF No. 1, *Complaint*, ¶10, 60, Page ID Nos. 4-5, 14) – allegations that must be taken as true for purposes of the pending motion. The suspension notice – which is part of the pleadings in this case – made no finding or suggestion that Ms. Cahall actively taught from any of the books at issue or required any student to read them (ECF No. 1, *Complaint*, ¶ 62-63, Page ID No. 14). To the extent that the defendants claim – or want to claim – otherwise, they will be required to develop a factual record proving that through the discovery process and then demonstrate that there is no genuine issue of material fact in that regard. That is not appropriate in the context of a motion for judgment on the pleadings.

Finally, defendants claim that it simply should have been obvious to Ms. Cahall that the books at issue would have not been allowed and go so far as to "suggest[] that [Ms. Cahall] may not have the professional judgment to be a teacher ***" simply because she has brought this lawsuit (ECF No. 12, Page ID No. 61). This is not a legal argument. This is a cheap shot. It is unnecessary, unprofessional and unethical. It is a not-so-subtle suggestion that Ms. Cahall – and those who share similar views – should simply capitulate to the dictates of those in power who hold different views if they want to maintain their careers. It can even be interpreted as a not-so-subtle threat from New Richmond to go after Ms. Cahall's teaching license if she continues to pursue this litigation. Such blatant intimidation should not be tolerated.

Board Policy 2240 is unconstitutional on its face. This Court should deny defendants' motion for judgment on the pleadings as to the First Claim for Relief, grant plaintiff's cross-motion for partial judgment on the pleadings, and declare that Board Policy 2240 is unconstitutional on its face.

## II.     Plaintiff States A Claim That Board Policy 2240 Violated Plaintiff's Right To Due Process As Applied To Her

There really can be no dispute that the terms "controversial issue" and "instructional program" in Board Policy 2240 are unconstitutionally vague and do not meet the basic requirements of substantive due process.  Defendants have not cited to any decisional authority in support of their position and have deflected away from that by resorting to cheap shots and apparent threats by openly questioning Ms. Cahall's "professional judgment" to even be a teacher.  While that is unfortunate, it perhaps underscores the legal and factual weakness of defendants' position in this litigation and the importance of holding districts like New Richmond to established constitutional standards.

In issuing the discipline to Ms. Cahall, defendant Miller was unable to reference anything that would have made it clear to a person of average intelligence that it violated Board Policy 2240 for Ms. Cahall to have the four specific books at issue in her classroom library for non-instructional purposes.  Defendant Miller was unable to reference anything that would have made it clear that it violated Board Policy 2240 for Ms. Cahall to have a book in her classroom library that featured an LGBTQ+ character.

Unable to do so, defendant Miller resorted to the equally undefinable "values that many hold" in the "community."  This is ***exactly*** what the Courts in *Reynolds* and *Edelblut* held is impermissible.  A "community" is comprised of individuals – each of whom bring to the table their own divergent opinions, attitudes and biases.  It does not imply any type of consensus.[5] "Community" members may vary in the degree to which they promote their values within that "community" – some may be politically active and willing to use their position in the community

---

[5]     Defendant Miller many have unwittingly realized this in the suspension notification when he referenced only "the values that ***many*** hold" – not necessarily the values that "everyone" holds.

as a platform to advance their own values and/or denounce the values of others.  They may do it by seeking office or in aiding others seeking political office.  They may do it from the pulpit through religious organizations.  They may simply speak their mind to anyone who is within earshot.  Conversely, they may simply keep quiet.  All of this – of course – is consistent with individual First Amendment rights to speak one's conscience or not speak one's conscience.

The net effect is that the concept of "community values" simply is incapable of being defined in a manner that will comport with the due process requirements outlined herein. Defendants make no effort to even try and do so because it simply cannot be done.  Any definition of "community values" is going to be inherently dependent upon the "political, social, and moral assumptions" of the individual trying to define it.  *Reynolds*, 732  F.Supp. 3rd at 807.

Ms. Cahall states a valid claim for relief that her due process rights were violated when Board Policy 2240 was applied to her.  The motion for judgment on the pleadings should be denied.

## III.    Plaintiff States A Claim That Defendants Violated Plaintiff's Right to Equal Protection

In her Third Claim for Relief, Ms. Cahall alleges that the defendants violated her rights to Equal Protection under the Fourteenth Amendment by allowing other District teachers and employees to utilize District resources to promote faith-based activities while at the same time not allowing Ms. Chall to maintain books in her classroom library that aligned with her religious beliefs[6] even though those books were not prominently displayed and were not used for

---

[6]     Defendants devote considerable attention to contesting whether Ms. Cahall's beliefs – as plead in the complaint – are "religious" beliefs.  Defendants allege that "common sense suggests that an ordinary school superintendent could reasonably assume that all individuals who chose to go into the teaching profession have the philosophy or social belief that all children are deserving of love, acceptance, and respect" and that what Ms. Cahall is claiming is a "secular theme common in education" (ECF No. 12, Page ID Nos. 63-64).  Aside from the fact that Ms. Cahall alleges that she specifically told defendant Miller about the religious nature of her beliefs during the pre-disciplinary hearing (ECF No. 1, *Complaint*, ¶ 58-60, Page ID No. 14), it simply is not the place of a governmental entity (and by extension its legal counsel) to pass judgment on what is or is not a valid religious belief.  See, e.g., *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531 (1993) ("[R]eligious beliefs need not be acceptable, logical, consistent, or comprehensible to others in order to merit First Amendment protection"); *Sturgill*

instructional purposes.  Specifically, the complaint alleges that teachers used District-provided email accounts to promote an event called "Blessing of Monroe" wherein participants were invited to engage in individual and group prayer in the school building prior to the commencement of the school year (ECF No. 1, *Complaint*, ¶ 51, Page ID No. 12).  Teachers were also permitted to use District-provided email accounts to publicize an organization called "Samaritan's Purse" which is involved in distributing a variety of items to children in over 170 countries, along with a Bible storybook translated into the language of the child receiving it (ECF No. 1, *Complaint,* ¶ 52-53, Page ID Nos. 12-13).  Finally, the Complaint alleges that the District has generally allowed employees to display and wear religious insignia, including Christian crosses, in a manner even more visible to students than the four books at issue in this case (ECF No. 1, *Complaint*, at ¶ 50, Page ID No. 12).  All of these allegations must be taken as true for purposes of defendants' pending motion.

Defendants assert that this claim must be dismissed because they allegedly did not know about Ms. Cahall's religious beliefs.  The extent of what they knew or did not know is ultimately a factual issue that cannot be resolved until after the completion of discovery (and most likely not until a trial).  The Complaint alleges that Ms. Cahall informed defendant Miller ***during*** the disciplinary hearing about her beliefs and why she kept the books in her non-instructional classroom library.  This must be taken as true for purposes of defendants' motion.  That hearing occurred on November 4, 2024.  The suspension was issued on November 6, 2024 – two days later (ECF No. 1, *Complaint* at ¶ 59-61, Page ID No. 14).

---

*v. American Red Cross*, 114 F.4th 803, 809-810 (6th Cir. 2024) ("[O]ur First Amendment jurisprudence *** commands that courts may not question the veracity of one's religious beliefs."); *Sequoyah v. Tennessee Valley Authority*, 620 F.2d 1159, 1163 (6th Cir. 1980) ("There is no requirement that a religion meet any organizational or doctrinal test in order to qualify for First Amendment protection.").

It can be inferred simply from this undisputed time sequence that defendant Miller knew about Ms. Cahall's religious beliefs as he was contemplating possible discipline – at which point the onus was on him to undertake any further inquiry he felt necessary regarding those beliefs. Defendants give no explanation as to why Ms. Cahall should not be afforded this inference at this stage of the pleadings. Defendants to not cite to any precedent which would support any contention that Ms. Cahall was required to do any more under the circumstances to place defendants on notice as to her beliefs.

Defendants next claim that Ms. Cahall has failed to plead what they label as "plausible comparator evidence." The complaint again alleges otherwise. The complaint identifies two specific instances where the District allowed teachers to engage in religious activity – allegations that must be taken as true for purposes of defendants' motion. The complaint also alleges that the District allows teachers to wear religious insignia and symbols in the present of students. The issue that is really before the Court – which defendants do not address in anything other than a cursory manner – is whether those allegations are sufficient to plead a violation of Ms. Cahall's right to equal protection.

It is axiomatic that the Constitution "protect[s] religious observers against unequal treatment." *Lukumi*, 508 U.S. at 542. This prohibition applies not only to laws intended to reach protected religious behavior, but also to the selective enforcement of otherwise "neutral" laws in a way that discriminates against protected religious activity. See, e.g., *Cruz v. Beto*, 405 U.S. 319, 322 (1972) (unconstitutional to deny Buddhist prisoner the same opportunity to pursue his faith comparably to that afforded a fellow prisoner). Accord *Meriwether*,, 992 F.3rd at 512-513.

This issue was addressed in *Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Commission*, 584 U.S. 617 (2018). The Commission had found that a Christian bakery owner had

24

engaged in unlawful discrimination when he refused to bake a wedding cake for a same-sex couple because of his religious beliefs. Previously, however, the Commission had found that other bakers who had refused to create cakes that had demeaned gay people or gay couples had acted lawfully. Reaffirming that the bakery owner "was entitled to the neutral and respectful consideration of his claims in all of the circumstances of the case," 584 U.S. at 634, the Court held:

> A principled rationale for the difference in treatment of these two instances cannot be based on the government's own assessment of offensiveness. Just as "no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion ***, it is not, as the Court has repeatedly held, the role of the State or its officials to prescribe what shall be offensive. *** The Colorado court's attempt to account for the difference in treatment elevates one view of what is offensive over another and itself sends a signal of official disapproval of [the baker's] religious beliefs.

*Masterpiece Cakeshop*, 584 U.S. at 638.

In *Niemotko v. Maryland*, 340 U.S. 268 (1951), the Court invalidated the misdemeanor convictions of several Jehovah's Witnesses who were convicted of disorderly conduct after gathering in a public park to engage in religious activity at the invitation of other religious groups. Although there was no formal ordinance prohibiting or regulating the use of the park, it apparently was customary for organizations desiring to use the park for meetings and celebrations to obtain a permit from the local park commissioner or the local city council. The Jehovah's Witnesses had applied for a permit on multiple occasions and were denied every time even though other groups had been granted permits. There weas no evidence of any standards to guide officials on whether to grant or deny permits – it was completely arbitrary. The only ostensible reason for the repeated denial of the permits was dislike of the group and disagreement with their views. When the group appeared and began to speak, they were immediately arrested and charged with disorderly conduct even though there was no evidence of disorder, violence and they were conducting themselves properly. In throwing out the convictions, the Supreme Court found it "inescapable" that they

were denied permits simply because the city council disagreed with their religious views. "The right to equal protection of the of the laws, in the exercise of those freedoms of speech and religion protected by the First and Fourteenth Amendments, has a firmer foundation than the whims or personal opinions of a local government body." *Niemotko*, 340 U.S. at 272. And so it is in this case as well.

Defendants will be quick to point out that a city park or bakery are more "traditional" public forums and a public school traditionally is not. While there is some truth to that in the abstract, it too is beside the point. Even in a non-public forum, the law is clearly established that the state cannot engage in viewpoint discrimination and cannot deny access to the forum on the basis of the government's opposition to the speaker's viewpoint. See, e.g. *Cook v. Gwinnett County School District*, 424 F.3rd 1313, 1321 (11th Cir. 2005). By permitting other teachers and staff to wear religious insignia in the presence of students or to use District resources such as email accounts to promote faith-based activities like the "Blessing of Monroe" or the "Samaritan's Purse" drive, New Richmond has – at least implicitly – knowingly allowed its employees to engage in religious expression within the school building. Once New Richmond allowed them to do so, the Equal Protection clause required that Ms. Cahall be afforded the same privilege as are other teachers and staff. The District cannot condition exercise of that privilege based upon whether or not the decision-maker agrees or disagrees with Ms. Cahall's religious views. "A principled rationale for the difference in treatment of these two instances cannot be based on the government's own assessment of offensiveness" *Masterpiece Bakeshop*, 584 U.S. at 638. While the religious beliefs of those teachers and staffers who engaged in such conduct may be deemed – in the eye of some observers – to be more "mainstream" it remains that New Richmond still must maintain neutrality to differing religious viewpoints.

26

Defendants present no real argument to the contrary. Ms. Cahall has plead facts indicating that she was treated less favorably because of her religious beliefs than were others employed by New Richmond. The District has made no real effort to argue that the differing treatment was justifiable or Constitutional. Ms. Cahall states a valid claim for violation of her rights to equal protection and Defendants' motion for judgment on the pleadings should be denied as to the Third Claim for Relief.[7]

IV.   **Plaintiff States A Claim That Defendants Violated Plaintiff's Rights Under the Free Exercise and Establishment Clauses of the First Amendment.**

Ms. Cahall's Fourth Claim for Relief is closely related to her Third Claim for Relief and alleges that New Richmond has violated the Establishment Clause by allowing other New Richmond teachers and staff to use New Richmond resources to engage in blatantly religious activity while denying Ms. Cahall to simply maintain books that align with her religious values. As in *Masterpiece Cakeshop*, "[a] principled rationale for the difference in treatment of these two instances cannot be based on the government's own assessment of offensiveness." 534 U.S. at 638. New Richmond cannot determine who gets to engage in religious activity on school premises and who does not based upon its own assessment of what views are proper. A violation of the Establishment Clause has been properly plead.

A violation of the Free Exercise Clause has also been properly plead. The proper interpretation and application of the Free Exercise Clause was recently addressed in *Kennedy v. Bremerton School District*, 597 U.S. 507 (2022), where the Supreme Court held that a public school district violated the Free Exercise Clause when it punished a high school football coach for

---

[7]      The defendants' reliance upon cases like *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3rd 344 (6th Cir. 1998) and *Clayton v. Meijer, Inc.* 281 F.3rd 605 (6th Cir. 2002) (ECF No. 12, Page ID No. 65) is puzzling. Both are statutory employment discrimination claims brought against ***private*** employers. They have nothing to do with the First Amendment religion clauses or the Fourteenth Amendment's Equal Protection clause. They are completely irrelevant to this case.

kneeling at midfield after games to offer a quiet personal prayer.  It was undisputed that no students or team members were ever compelled to engage in prayer with their coach, although over the period of time that the coach had been engaging in prayer, team members (and sometimes even opposing team members) had voluntarily joined him.

In setting forth the proper analysis for addressing the First Amendment claims before it, the Court observed that it was "no accident" that the Free Speech and Free Exercise clauses "work in tandem."  "It is a natural outgrowth of the framers' distrust of government attempts to regulate religion and suppress dissent."  597 U.S. at 523-524.  To establish a claim under the Free Exercise clause, a plaintiff must make an initial showing "that a government entity has burdened his sincere religious practice pursuant to a policy that is not 'neutral' or 'generally applicable.'"  597 U.S. at 525.  Once that showing has been made, "this Court will find a First Amendment violation unless the government can satisfy 'strict scrutiny' by demonstrating its course was justified by a compelling state interest and was narrowly tailored in pursuit of that interest."  597 U.S. at 525 (citing *Lukumi*, 508 U.S. at 546).  Additionally, a policy will fail the "general applicability" requirement if it "'prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way' or if it provides 'a mechanism for individualized exemptions.'"  597 U.S. at 526 (quoting *Fulton v. Philadelphia*, 593 U.S. 522, 533 (2021)).

These requirements have been plead in this case.  Ms. Cahall has plead that she has sincerely held religious beliefs (ECF No. 1, *Complaint*, ¶ 12, 37, 48-49, Page ID Nos. 5, 10-12) – beliefs that have been directly impacted by New Richmond's three-day unpaid suspension and threat of further discipline.  Ms. Cahall has also plead the existence of a "policy" that is neither "neutral" nor "generally applicable."  To determine whether a law is truly neutral "courts must

28

look beyond the text and scrutinize the history, context and application of a challenged law." *Meriwether*, 992 F.3rd at 512. "In this way, the Free Exercise Clause guards against 'even subtle departures from neutrality on matters of religion.'" *Meriwether*, 992 F.3rd at 512.

To maintain consistency with Meriwether, much of this analysis cannot be performed in the context of a motion for judgment on the pleadings. A proper analysis of the "history, context and application" of Board Policy 2240 requites the development of a factual record through the discovery process (particularly with respect to how New Richmond has applied Board Policy 2240 since it went into effect). On its face, it is submitted that Board Policy 2240, by virtue of its extreme vagueness, is not capable of being applied in such a manner. Board Policy 2240 leaves the determination of what is or is not a "controversial issue" up to the political and moral whim of the person in charge of enforcing it. In the Free Exercise Clause contest, it leaves the determination of what is or is not a "religious" belief up to a government official. This too is impermissible and New Richmond makes no argument to the contrary.

Ms. Cahall has also plead that New Richmond has allowed other teachers and staff to use its resources to publicize religious events such as the "Blessing of Monroe" and "Project Shoebox" as well as allowing teachers and staff to wear religious insignia in the presence of students. From these facts a finder of fact can infer that New Richmond has expressed at least an implicit endorsement of the expression of certain religious views over those held by Ms. Cahall. This raises an issue as to whether Board Policy 2240 really is "neutral" or "generally applicable" in its application. It also raises the issue of whether New Richmond has implicitly adopted an unwritten policy regarding what religious practices teachers can engage in and what they cannot that it is applying in a non-neutral manner. Given that the facts plead in this case mut be taken as true, there are issues that are not properly addressed in the context of a motion to dismiss but at a minimum

29

will require the development of a factual record through the discovery process. At this point, a claim upon which relief can be granted has been plead.

At this point, the burden shifts to New Richmond to "show[] that its restrictions on the plaintiff's protected rights serve a compelling interest and are narrowly tailored to that end" *Kennedy*, 597 U.S. at 531-532. Defendants make no real effort to do so and in fact do not even discuss the *Kennedy* analysis in their motion. Instead, defendants attempt to apply a "rational basis" test to support their actions. This is not what *Kennedy* mandates. *Kennedy* mandates that a "strict scrutiny" analysis be applied. New Richmond cannot satisfy this requirement because it fails to show simply allowing the disputed books to be maintained in a classroom for non—instructional purposes undermines a compelling state interest. The fact that a parent or administrator might disagree with the religious message being conveyed does not strip that message of constitutional protection. New Richmond must still maintain neutrality and cannot favor or disfavor one religious message over another. *Meriwether*, 992 F.3rd at 512 ("when [a government] appl[ies] an otherwise neutral law with religious hostility, they violate the Free Exercise Clause" *Meriwether*, 992 F..3rd at 512. That is what has been alleged in this case.

Defendants attempt to circumvent this by claiming that the books at issue contain "sexuality" content and not "religious" content. Ms. Cahall maintains that she maintained the books because she felt that they could serve as a positive tool to promote the values of being respected, accepted and loved for who they are to any LGBTQ+ student who might come to her for guidance or support (ECF No. 1, *Complaint*, ¶ 48-49, Page ID Nos. 12-13) – values she alleges are rooted in her religious beliefs. While some may disagree with the substance of Ms. Cahall's religious beliefs, it remains that it is not New Richmond's place to judge whether Ms. Cahall's beliefs are religious or secular; nor is it New Richmond's place to determine which religious

messages it feels are worthy of permitting and which are not. Once New Richmond opens itself up to permitting the expression of one religious viewpoint, it must make that forum equally accessible to other religious viewpoints as well – including those of Ms. Cahall. This is the overriding principle that cases like *Masterpiece Cakeshop* stand for. Its refusal to do so even after being told by Ms. Cahall what her religious beliefs are is precisely the type of religious hostility that *Masterpiece Cakeshop* and *Meriwether* hold violates the Free Exercise and Establishment clauses.

Ms. Cahall has plead a claim for violation of her rights under the Free Exercise and Establishment clauses of the First Amendment. The motion for judgment on the pleadings should be denied.

## V.     Defendant Miller Is Not Entitled To Qualified Immunity

Courts will follow a two-tiered inquiry to determine whether a defendant is entitled to qualified immunity. See *Goodwin v. City of Painesville*, 781 F.3rd 314, 321 (6th Cir. 2015); *Austin v. Redford Township. Police Department*, 690 F.3rd 490, 496 (6th Cir. 2012)). "To satisfy the first prong at the summary-judgment stage, the plaintiff must show that 'based upon the applicable law, the facts viewed in the light most favorable to the plaintiff show that a constitutional violation has occurred.'" *Brown   v. Lewis*, 779 F.3rd 401, 411 (6th Cir. 2015) (quoting *Sample v. Bailey*, 409 F.3rd 689, 695 (6th Cir. 2005)).

To satisfy the second prong, a plaintiff must show that "the violation involved a clearly established constitutional right of which a reasonable person would have known." *Id*. (quoting *Sample*, 409 F.3rd at 696). A right is clearly established if '[t]he contours of that right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Goodwin*, 781 F.3rd at 325 (quoting *Wheeler v. City of Lansing*, 660 F.3rd 921, 938 (6th Cir.

31

2011)). "The court 'need not, of course, find a case in which the very action in question has previously been held unlawful, but in the light of pre-existing law, the unlawfulness must be apparent.'" *Brown*, 779 F.3rd at 412 (quoting *Comstock v. McCrary*, 273 F.3rd 693, 711 (6th Cir. 2001)). "The dispositive question is 'whether the defendants had fair warning that their actions were unconstitutional.'" *Griffith*, 473 F.3rd at 659 (quoting *Cummings v. City of Akron*, 418 F.3rd 676, 687 (6th Cir. 2005)).

Defendants focus their attention primarily on the second prong. With respect to the first prong, it is submitted that the facts plead in the complaint demonstrate sufficiently show that a constitutional violation has occurred under the controlling case law discussed herein. With respect to the second prong, it is submitted that the case law on the legal issues raised in this case is and has been sufficiently clear for some period of time that a reasonable public official – including a reasonable public school superintendent – would understand that engaging in the conduct outlined in the complaint violates those rights.

The due process requirement that a law or other regulation provide sufficiently fair notice of the standard of conduct to which a citizen is held accountable has been established by multiple Supreme Court decisions (including those discussed herein) and expounded upon by numerous cases from the Sixth Circuit Court of Appeals. All of these decisions ought to be sufficient to make it quite clear to a reasonable public official what is required of a regulation to comply with due process. Not only do these decisions demand a level of clarity in what is or is not prohibited by the regulation at issue, these decisions also make it abundantly clear that enforcement standards must be sufficiently precise so as not to invite arbitrary or discriminatory enforcement.

Under this established body of law, it is submitted that the law is and has been sufficiently clearly established that a reasonable person would know that a policy that purports to limit or

prohibit something that is "controversial" – without further definition – will not meet due process requirements. The Sixth Circuit was quite clear on that point specifically in regards to the use of the term "controversial." *United Food & Commercial Workers Union, Local 1009*, 163 F.3rd at 359. Beyond this established body of precedent, three recent district court decisions issued before Ms. Cahall was disciplined applied these established principles specifically in the context of education policy in holding that so-called "divisive issues" standards adopted to limit the teaching of certain concepts in public education were unconstitutional – not because of what they tried to limit but because the language used was not sufficiently clear as to put a reasonable teacher on notice as to exactly what was or was not prohibited.

The policies stuck down in those cases are sufficiently similar to Board Policy 2240 and are – if anything – actually clearer than Board Policy 2240 in that they at least attempted to identify subjects or concepts that could not be taught. Board Policy 2240 does not even make that effort. Based upon the controlling case law, it is submitted that no reasonable official – including a reasonable school superintendent – would believe that a policy purporting to limit the consideration of "controversial issues" in a school setting that does not purport to define what constitutes "controversial" beyond something that two people might disagree about and provides no enforcement guidance to protect against arbitrary and discriminatory enforcement is constitutional. Nor would any reasonable official believe that it would be constitutional to resort to undefinable "values that many in the community hold" as an enforcement standard. Defendant Miller is not entitled to qualified immunity on the due process claims.

Defendant Miller also is not entitled to qualified immunity on the Equal Protection, Free Exercise and Establishment clause claims. Precedent from the Supreme Court requiring neutrality as to religion is likewise well-established. *Masterpiece Cakeshop* – decided before the events in

33

this case occurred – is very clear on that point. *Meriwether* (also decided before the events in this case) is equally clear on that point. Based upon the clarity of the holdings in *Masterpiece Cakeshop* and *Meriwether*, it is submitted that no reasonable governmental official – including a school superintendent – would believe that he could punish an employee for engaging in an act in furtherance of a sincerely held religious belief when allowing other employees to engage in religious expression.

On all of the constitutional issues raised that have been raised in this case, the governing case law is clear. Defendants do not cite to any authority from which it can be gleaned that a reasonable official in Miller's position might believe these actions to be constitutional in spite of established precedent. Qualified immunity is inappropriate.

## VI.     Plaintiff States A Claim For Relief Under R.C. 2307.67

While it is agreed that dismissal of Ms. Cahall's claim under R.C. 2307.67 would be proper if – but ***only*** if – all of Ms. Cahall's constitutional claims are dismissed, sovereign immunity under Ohio Rev. Code Chapter 2744 does not provide an independent basis for dismissal of this claim. Sovereign immunity under R.C. Chapter 2744 is not absolute. RC 2744.09(B) expressly provides that sovereign immunity does not apply to "civil actions by an employee *** against [a] political subdivision relative to any matter that arises out of the employment relationship between the employee and the political subdivision." An action is deemed to arise from the employment relationship "if there is a causal connection or a causal relationship between the claims raised by the employee and the employment relationship." *Sampson v., Cuyahoga Metropolitan Housing Authority*, 131 Ohio St. 3rd 418 (2012), paragraph two of the syllabus. Notwithstanding the myriad of constitutional issues presented by this case, at its core it arises out of the employment

34

relationship between Ms. Cahall and New Richmond. This is sufficient to state a claim upon which relief can be granted and judgment on the pleadings for defendants as to this claim is improper.

## VII.   Dismissal Of The Official Capacity Claims Is Not Mandated

Defendants seek dismissal of the official capacity claims against Miller and the members of the Board of Education on the grounds of redundancy (ECF 12, at 5-6, Page ID Nos. 57-58). This is not required. It is true of course that official capacity claims against a public official are treated as claims against the entity itself. See *Kentucky v. Graham*, 473 U.S. 159, 165 (1985). Recent decisions from this District, however, have recognized that this does not impose any "affirmative mandate" requiring dismissal of "official capacity" claims on redundancy grounds. See, e.g., *Updike v. Jonas*, 700 F.Supp. 3rd 597, 604 (S.D. Ohio 2023); *Doe v. Springboro Community City School District Board of Education*, Case No. 1:19-CV-785 (S.D. Ohio April 15, 2021) (collecting cases). Defendants do not cite to a single case that supports their position. Defendants' motion for judgment on the pleadings should be denied as to this issue as well.

## CONCLUSION

For the foregoing reasons, defendants' motion for judgment on the pleadings should be denied. Plaintiff's partial motion for judgment on the pleadings should be granted as to the First Claim for Relief and this Court should declare Board Policy 2240 to be unconstitutional on its face.

Respectfully Submitted,

s/ *Mark P. Herron*
Mark P. Herron (0051998)
5001 Mayfield Road, Suite 212
Lyndhurst, Ohio 44124
(216) 280-2828
Email: herronlaw@msn.com

Attorney for Plaintiff

35