# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

**KAREN CAHALL,**

      **Plaintiff,**

        **v.**

**NEW RICHMOND EXEMPTED VILLAGE SCHOOL DISTRICT BOARD OF EDUCATION, et al.,**

      **Defendants.**

**Case No. 1:24-cv-688**

**JUDGE DOUGLAS R. COLE**

## OPINION AND ORDER

Plaintiff Karen Cahall is a third-grade math and science teacher in the New Richmond Exempted Village School District (the District), which Defendant New Richmond Exempted Village School District Board of Education (the Board) runs. The District, acting through one of the other individual Defendants—Superintendent Tracey Miller—imposed a three-day unpaid suspension on Cahall, asserting that she had violated the District's "controversial issues" policy based on certain reading materials she made available to the students in her classroom. She responded with this lawsuit. She claims that the policy under which she was suspended is so vague that it violates the Fourteenth Amendment's Due Process Clause, and that in applying the policy to Cahall, Superintendent Miller also violated the Equal Protection, Establishment, and Free Exercise Clauses. (Doc. 1). Defendants answered, (Doc. 9), and moved for judgment on the pleadings, (Doc. 12). Cahall, for her part, both responded to the motion (including cross-filing for judgment on the

pleadings as to one of her claims), (Doc. 16), and sought leave to amend her Complaint, (Doc. 17), which Defendants oppose on futility grounds, (Doc. 19). So there's a lot on the Court's plate. But for the reasons explained below, the Court agrees with Defendants that the Complaint, (Doc. 1), fails to set forth a plausible claim for relief and that the proposed amendments do not cure the deficiencies. Accordingly, the Court **GRANTS** Defendants' Motion for Judgment on the Pleadings (Doc. 12) and **DENIES**, on futility grounds, Cahall's Motion for Leave to Amend (Doc. 17).

## BACKGROUND

### A.     Cahall Added Four Books Exploring LGBTQ+ Themes to a Classroom Collection She Makes Available to Students in Her Third-Grade Math/Science Class.

In her Complaint, Cahall alleges that she has taught in the New Richmond Exempted Village School District for over thirty years.[1] (Doc. 1, #3). While the Complaint does not expressly allege the grade or subject matter she currently teaches, a discipline letter that she attaches to, and cites in, the Complaint as one of the bases for her claims, indicates that she is serving as a third-grade math/science teacher. (*Id*. at #14; Doc. 1-3, #29).[2]

---

[1] Because this matter comes before the Court on a motion under Rule 12(c), the Court accepts the well-pleaded allegations as true for now. *JPMorgan Chase Bank, N.A. v. Winget*, 510 F.3d 577, 581 (6th Cir. 2007). That said, the Court reminds the reader that ultimately they are just that—allegations.

[2] Cahall labelled, and refers to, the discipline letter as Exhibit 2 in her Complaint. (Doc. 1, #14). However, it appears on the docket as Doc. 1-3.

Cahall maintains a collection of books in her classroom that she makes available to students to read during in-class free time, (Doc. 1, #11), but that she does not otherwise use in connection with instructing the students, (*id.* at #14). The instant controversy arose when a parent complained about some of the books that Cahall included in that collection. (*Id.* at #13). In particular, in light of recent events that had occurred at the school (more on that below), Cahall decided to add four books to her collection: Ana on the Edge; The Fabulous Zed Watson; Hazel Bly and the Deep Blue Sea; and Too Bright to See. (*Id.* at #11). As Cahall describes them, these books "each deal with characters who are LGBTQ+ and are coming to terms with feeling different and excluded simply because they are LGBTQ+." (*Id.*). According to Cahall, the books "serve to reinforce [her] sincerely held moral and religious beliefs that all children, including children who are LGBTQ+ or the children of parents who are LGBTQ+, deserve to be respected, accepted, and loved for who they are." (*Id.* at #11–12).

**B.    Cahall Added the Books in Response to an Earlier Controversy About LGBTQ+ Policies in the School District.**

Cahall says her decision to add these books to her classroom collection grew out of what she describes as an earlier "controversy in the New Richmond District." (*Id.* at #10). According to Cahall, just before the 2021–22 school year, the District was considering allowing teachers to "wear Rainbow stickers on their name tags, or to display them on laptop cases or desk nameplates to show that [the teachers] were safe for LGBTQ+ students to confide in or to seek advice from." (*Id.* at #8). The District was also considering whether to provide students forms on which they could

designate their "preferred gender identity preferred pronouns and name." (*Id.*). Word got out, though, and the District received "numerous complaints from community members" opposing those policies. (*Id.* at #8–9). As a result, the Board elected *not* to move forward with either plan. (*Id.*). That in turn led still other members of the New Richmond community, this time those who supported LGBTQ+ rights, to register their disapproval of *that* decision at a public Board meeting on September 21, 2021. (*Id.* at #9). But that did not change the Board's decision. (*Id.*).

After the debate and concerned about how societal prejudice might impact LGBTQ+ students, Cahall conducted research in an effort to "educate herself regarding the emotional support needed by LGBTQ+ youth." (*Id.* at #10). Those efforts convinced her that these students had higher rates of "anxiety and depression," were more likely to consider or attempt suicide, and had "higher rates of alcohol and/or drug use." (*Id.*). She also discovered that they often "experience[] difficulty and delay in obtaining mental health care." (*Id.*).

In an effort to address those concerns and provide LGBTQ+ youth access to "safe spaces" and "safe people," Cahall added the four books mentioned above to her classroom collection. (*Id.* at #11). The collection itself consists of nearly 100 books, which are stored in bins. Students are free to grab books from the bins to read during free time, but, as noted above, Cahall does not assign, or teach from, the books. (*Id.* at #11, 14).

**C.    Cahall's Inclusion of the Four Books Resulted in a Three-Day Suspension.**

Cahall's inclusion of those books in her classroom collection ultimately led to the disciplinary consequences that form the heart of this suit. The Complaint does not make clear exactly when Cahall added the books to her collection (other than that it was presumably sometime after the events in 2021). But it does allege that, in late October 2024, a parent complained by email to the principal at Cahall's school, along with emailing each of the School Board members, "regarding the presence of these books in … Cahall's classroom." (*Id.* at #13). These emails eventually made their way to Superintendent Miller, who notified Cahall she must appear at a "pre-disciplinary hearing on November 4, 2024," regarding the books. (*Id.*).

At that hearing, Cahall acknowledged that the books were present, and that they were available to her students, but stated she did not use them as part of her curriculum or otherwise instruct from them. (*Id.* at #14). Further, she "did not initiate discussion of the books," or "otherwise use the books to indoctrinate students or endorse an LGBTQ+ lifestyle in her classroom." (*Id.*).

According to Cahall, Superintendent Miller did not make any factual finding that Cahall had used the books for instruction or initiated discussion about them, or even prominently displayed them in her classroom. (*Id.*). But the Superintendent nonetheless concluded that Cahall had violated a Board policy labeled "2240– Controversial Issues." (*Id.* at #15).

Cahall helpfully attaches that policy to her Complaint. (Doc. 1-2). The Board adopted the policy in 2009. It governs the school's approach to the "consideration of

controversial issues" in the classroom, and in particular imposes limitations on "the introduction and proper educational use of controversial issues." (*Id.* at #27). The policy goes on to define a "controversial issue" as "a topic on which opposing points of view have been promulgated by responsible opinion or likely to arouse both support and opposition in the community." (*Id.*). As for the limitations relating to controversial issues, the policy provides that they "may not be initiated by a source outside the schools unless prior approval has been given by the principal." (*Id.*). And the policy goes on to say that "[w]hen controversial issues have not been specified in the course of study, the Board will permit the instructional use of only those issues which may have been approved by the principal." (*Id.*). According to Cahall (and confirmed by the discipline letter she attaches to her Complaint, (*see* Doc. 1-3)), the Superintendent concluded she had violated this policy.

Although Cahall's Complaint does not expressly note it, the discipline letter she attaches to her Complaint also cites another Board policy—what the letter calls an "administrative guideline"—also relating to controversial issues. Specifically, the letter notes that "controversial issues" must be presented in a manner "in accordance with Board policy," which the letter says is set forth in "policy 2240 *and administrative guideline 2520A*." (Doc. 1-3, #29 (emphasis added)).

Unlike policy 2240, administrative guideline 2520A is not attached to the Complaint. But it is available on the District's website. The cited guideline governs the "selection of resource materials" for the District. Among other things, it provides that "[n]o print … materials which are not part of the District's basic or

supplementary materials are to be used with students without prior review and approval." https://perma.cc/MK7E-GDYG. The guideline then specifies the "critical criteria by which such materials are to be reviewed," including "the relationship to the course of study," and "the extent to which the content or presentation could create controversy among students, parents, and community groups." *Id.* Beyond that, to the extent that the books in Cahall's classroom constitute a "library," the administrative guideline also provides that, as to any materials "that could be controversial, as defined in Policy 2240," a teacher must obtain "approv[al] by the principal prior to purchase." *Id.*

Finding that Cahall had violated these controversial issue policies, the Superintendent imposed a three-day suspension. (*See* Doc. 1-3).

**D.  Cahall Responded to the Discipline by Suing.**

In response to her suspension, Cahall sued. She named the Board of Education, Superintendent Miller (in both his individual and official capacities), and each individual Board member (solely in their official capacities).

Based on the events described above, she advances five claims for relief, the first four of which arise under 42 U.S.C. § 1983, and the last of which arises under Ohio law. The first claim, which she appears to direct against all Defendants, asserts that Board Policy 2240 violates the Fourteenth Amendment's Due Process Clause because it is "unconstitutionally vague on its face and as applied [to Cahall]." (Doc. 1, #16). In particular, she contends the terms "controversial issue" and "instructional program" as used in that policy are so vague that a reasonable person would not

understand the terms, and they thus allow for "arbitrary and discriminatory enforcement." (*Id.*).

The remaining four claims for relief are directed solely against Superintendent Miller. That said, Cahall asserts them against Miller in both his individual and official capacities, so declining to name the other Defendants on them does not really change things much. That is because, as explained below, suing Miller in his official capacity amounts to suing the District.

As for their substance, the second claim seems to simply restate the unconstitutionally-vague due process claim set forth in the first claim and adds a request for punitive damages. (Doc. 1, #17–18). The third claim, though, differs. There, Cahall asserts that enforcing the Board policy against her in this manner violates the Equal Protection Clause. (*Id.* at #18–20). That is so, she says, because her conduct in adding the four books was based on sincerely held moral and religious beliefs. (*Id.* at #19). She then alleges that the District has treated various other "religious or faith-based activities such as 'Blessing of Monroe' and 'Samaritan's Purse,'" more favorably, thereby depriving her of equal protection. (*Id.*).

The fourth claim basically recasts those allegations of religious discrimination as also violating the First Amendment's Establishment and Free Exercise Clauses (collectively, the Religion Clauses), which the Fourteenth Amendment incorporates against the States.[3] (*Id.* at #21–23). Specifically, she says the Religion Clauses

---

[3] The Complaint suggests that these claims arise directly under the First Amendment. (*See* Doc. 1, #21–22). That is wrong. The First Amendment applies to the federal government. But the Fourteenth Amendment incorporates the relevant First Amendment clauses (Establishment and Free Exercise) as against the States. So the Court will address substance

prohibit Superintendent Miller "from using his authority to enforce and interpret [Policy 2240] to show official hostility to any religion or religious viewpoint … and further prohibit him from aiding, fostering, or promoting one religion or religious viewpoint over another." (*Id.* at #21). She contends that suspending her, while allowing the other religious activities noted above to proceed unimpeded, constitutes such impermissible discrimination.

Finally, in her last claim she alleges that, in committing the various constitutional violations alleged above, Superintendent Miller also violated an Ohio statute that makes it a criminal offense for any public servant, acting under color of his or her office, to violate the constitutional rights of any person. (*Id.* at #23 (citing Ohio Rev. Code § 2921.45)). She then bases her actual claim on another statute, Ohio Rev. Code § 2307.60, that provides a civil cause of action to anyone injured in their person or property by a criminal act. (*Id.*).

## E.    The Defendants Moved for Judgment on the Pleadings, And Cahall Seeks Leave to Amend.

The Defendants jointly answered the Complaint. (Doc. 9). Less than a month later, they filed a joint Motion for Judgment on the Pleadings. (Doc. 12). That motion seeks dismissal of all five claims as a matter of law.

Cahall responded to that motion and also cross-moved for judgment on the pleadings as to her first claim for relief. (Doc. 16). Separately, she sought leave to amend, (Doc. 17), providing a proposed Amended Complaint, (Doc. 17-1). The

---

over form, and will treat Cahall as having asserted this claim under the Fourteenth Amendment.

proposed Amended Complaint adds a few additional allegations. In particular, it points to two other books that are available in the school's library that could be considered "controversial." (Doc. 17-1, #159–60). And it provides additional examples of the District allegedly treating other religious beliefs more favorably—in particular, allowing other employees to "publicly display[] insignias and symbols of their religious beliefs," and allowing another teacher to display a Christian message on a classroom sign. (*Id.* at #160).

Defendants, for their part, opposed Cahall's cross-motion for judgment on the pleadings, (Doc. 18), and also, on futility grounds, the motion for leave to amend, (Doc. 19). The parties then replied in support of their respective motions. (Docs. 18, 20, 23). Lastly, Cahall filed a motion for leave to file notice of supplemental authority. (Doc. 24). So with that, the matter is ripe for review.

## LEGAL STANDARDS

"After the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c). When reviewing such motions, the Court applies the same standard as it would apply to a motion to dismiss under Rule 12(b)(6). *Hindel v. Husted*, 875 F.3d 344, 346 (6th Cir. 2017). That means the Court takes "all well-pleaded material allegations of the pleadings of the opposing party" as true, and grants the motion "only if the moving party is nevertheless clearly entitled to judgment." *JPMorgan Chase Bank,* 510 F.3d at 581 (cleaned up). But the Court "need not accept as true legal conclusions or unwarranted factual inferences." *Id.* at 581–82.

10

While either party can move for judgment on the pleadings, that above standard plays out differently depending on the moving party. For a plaintiff to withstand a defendant's motion for judgment on the pleadings, the "complaint must contain direct or inferential allegations respecting all the material elements under some viable legal theory." *Commercial Money Ctr., Inc. v. Illinois Union Ins. Co.*, 508 F.3d 327, 336–37 (6th Cir. 2007). And the factual allegations must both "give notice to the defendant as to what claims are alleged" and "plead 'sufficient factual matter' to render the legal claim plausible, i.e., more than merely possible." *Fritz v. Charter Twp. of Comstock*, 592 F.3d 718, 722 (6th Cir. 2010) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

By contrast, if the plaintiff is the party who has moved, then the allegations in the defendant's *answer* must be treated as true. In other words, for a plaintiff to prevail on such a motion, the plaintiff must show that, based on the facts to which the defendant has admitted, the plaintiff is entitled to judgment as a matter of law.

Separately, Cahall has moved for leave to amend her Complaint. (Doc. 17). A plaintiff can amend once as a matter of course, but only so long as the plaintiff seeks to do so within twenty-one days of the defendant's answer. Fed. R. Civ. P. 15(a)(1). Cahall did not meet that deadline here. Beyond that, a plaintiff can amend only with "the opposing party's written consent" or leave of the Court. Fed. R. Civ. P. 15(a)(2). But, generally, the Court should "freely give leave when justice so requires." *Id.* That

said, if a proposed amendment is futile—in other words, if the pleading as amended remains fatally defective—a court need not allow the amendment. *Grand Traverse Band of Ottawa & Chippewa Indians v. Blue Cross Blue Shield of Michigan*, 146 F.4th 496, 515 (6th Cir. 2025).

## LAW AND ARGUMENT

There are presently three motions before the Court. In the first two, the parties have cross-moved for judgment on the pleadings as to the due process vagueness claim (which Cahall presses in claims one and two).[4] (Doc. 12, #58–62); Doc. 16, #89–106). And the Defendants (but not Cahall) have also moved for judgment on the pleadings as to the remaining two § 1983 claims (equal protection and the Religion Clauses), and as to the state-law claim (based on Cahall's failure to advance a viable underlying constitutional violation). (Doc. 12, #62–70). The remaining motion is Cahall's request for leave to amend her Complaint, (Doc. 17), which Defendants attack on futility grounds, (Doc. 19).[5]

To simplify matters, the Court will treat the Complaint as though it included Cahall's proposed amended allegations. But the Court concludes that, even in light of those additional allegations, Cahall has failed to plead viable claims on vagueness, equal protection, or Religion Clause grounds. And that in turn means that the state-

---

[4] True, Cahall says that her motion is directed only at the first claim for relief. But the first and second claims for relief are identical in substance. So the Court will address both claims together, and treat the parties as cross-moving for judgment on the pleadings as to the vagueness issue.

[5] Cahall also filed a Motion for Leave to File Notice of Supplemental Authority (Doc. 24). The Court **GRANTS** that motion and considered that authority in reaching its decision here.

law claim also fails. But beyond that, because the Court reaches that conclusion based on all of the allegations, including the new proposed amended allegations, that also means that the proposed amendment is futile. In explaining those various results, Court addresses the claims in the order that Cahall presents them. But before turning to the claims, the Court takes a brief detour to address a procedural matter that Defendants also raise.

## A. Defendants are Correct that the Official-Capacity Claims against the Individual Defendants are Duplicative of the Claims against the District.

Defendants begin their attack on Cahall's Complaint by challenging various claims as duplicative. (Doc. 12, #57–58). Specifically, they assert that Cahall's official-capacity § 1983 claims against the individual Defendants are redundant in light of her claim against the Board itself. (*Id.*). They are correct.

A plaintiff can name a state actor in a § 1983 suit in either the state actor's individual capacity, official capacity, or both. Individual-capacity claims impose liability on the state actor themself. But official-capacity claims run against the state actor's employer. So, for example, there is no difference between suing the mayor of a city in her official capacity and suing the city itself. Should the plaintiff prevail, the city, not the mayor, will be on the hook for the judgment. Nor is there any difference in the substantive standards that would apply to those two claims (i.e., the official-capacity claim against the mayor and the direct claim against the city). In short, official-capacity claims are identical in all regards to a direct claim against the state actor's government-entity employer. As a result, courts routinely dismiss official-

capacity claims as duplicative when the plaintiff is also suing the government entity. *See Rideout v. Shelby Twp.*, 691 F. Supp. 3d 816, 828–29 (E.D. Mich. 2023) (collecting cases within the Sixth Circuit).

Here, Cahall engages in just such duplicative pleading. She names each Board member in his or her official capacity, and she also includes an official-capacity claim (along with an individual-capacity claim) against the Superintendent. (Doc. 1, #1–2). But at the same time she sues the Board directly. (*Id.*). The official-capacity claims are all duplicative of the latter direct action against the Board, so the Court dismisses those official-capacity claims, and does so with prejudice.

## B. The Board Policy on Controversial Issues is not Unconstitutionally Vague.

With that out of the way, the Court turns to the substance of Cahall's claims, starting with the due process void-for-vagueness claim. Defendants attack that claim on two grounds. First, they contend that teachers do not have a constitutional right to select materials for their classroom, and from this they argue that any constitutional claim predicated on such a selection fails. (Doc. 12, #59–60). Second, they claim that, independent of whether the policy is vague in the abstract, it is not vague as applied on the facts here. (*Id.* at #60–61). The first argument misses the mark, but the second one scores.

In pressing their first argument, Defendants target a strawman. They may well be right that the Constitution does not provide a right for teachers to select materials, but that misses the point. Cahall is not claiming that the Defendants violated the Due Process Clause by punishing her for selecting certain books. Rather,

she is saying that the policy on which Defendants relied to accomplish that end needed to be sufficiently clear to put her on notice of which book selections may subject her to such punishment. And she is correct on that front. The void-for-vagueness doctrine applies to all statutes or rules that impose punitive consequences, not merely those that involve expressive activities subject to First Amendment protection. *See, e.g.*, *Johnson v. United States*, 576 U.S. 591, 636–39 (2015) (Alito, J., dissenting) (discussing the vagueness standard for challenges which do not involve First Amendment freedoms). As discussed more fully below (*see* Part D), the Court generally agrees with Defendants that teachers do not have a constitutionally enshrined right to select classroom materials of their choosing. *See Evans-Marshall v. Bd. of Educ. of the Tipp City Exempted Vill. Sch. Dist.*, 624 F.3d 332, 341–42 (6th Cir. 2010). But teachers, as terminable-for-cause public employees, do have a due process right to know what conduct may lead to their termination. In sum, Defendants' argument against a claim that Cahall is not pressing is a non-starter.

Defendants fare better, though, on their second argument—that Cahall has failed to plausibly allege a viable void-for-vagueness claim. A statute (or in this case a policy that carries disciplinary consequences) is void for vagueness under the Due Process Clause if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *Holder v. Humanitarian Law Project*, 561 U.S. 1, 18 (2010) (quoting *United States v. Williams*, 553 U.S. 285, 304 (2008)). Importantly, though, courts must "consider whether a statute is vague as applied to the particular

15

facts at issue, for '[a] plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others." *Holder*, 561 U.S. at 18–19 (quoting *Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 495 (1982)). As it turns out, this restriction dooms Cahall's claim.

Before explaining why, though, the Court tarries a moment to explain more fully why the actual facts of the specific event matter to the constitutional analysis. After all, Cahall mounts both a facial and an as-applied challenge. At least as to the former, one could argue, the particular facts of the case should not matter. It turns out that is wrong, though, for one or both of two related reasons. First, it may be understood as reflecting prudential standing concerns. That argument would go something like this: The void-for-vagueness doctrine is designed to ensure that affected persons have notice of potential consequences. So a person who in fact has such notice (because the policy is not vague as applied to their circumstances) cannot rely on others' potential lack of notice as the basis for their claim. In other words, to have standing, the person him- or herself, not some third party, must have suffered a concrete injury as a result of the constitutional violation (i.e., the vagueness).

Alternatively, it could be understood based on the nature of a facial challenge. That is, for a facial due-process challenge to succeed, as with most facial constitutional challenges, the plaintiff must show that the law is unconstitutional (here, vague) in all of its applications. *See, e.g.*, *Hoffman Ests.*, 455 U.S. at 497 (noting that in cases involving enactments outside the free expression context, a facial challenge will succeed only if the enactment is "impermissibly vague in all of its

16

applications"). Of course, if the statute (or policy) is not vague as to the plaintiff's particular circumstances, then it perforce is not vague in all circumstances, meaning the facial challenge fails. And likewise an as-applied challenge fails if the policy is not unconstitutionally vague on the facts presented.

However understood, though, the result is clear: the Supreme Court has expressly adopted the "rule" noted above: "'[a] plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others.'" *Holder*, 561 U.S. at 20 (quoting *Hoffman Ests.*, 455 U.S. at 495). True, *Hoffman Estates* carves out an exception to that principle for regulations that "involve First Amendment freedoms"—in which case things like the overbreadth doctrine come into play. 455 U.S. at 495 n.7. That doctrine relaxes aspects of both the third-party standing and unconstitutional-in-all-applications requirements set forth above. But two problems with applying that exception here. First, the Supreme Court in *Holder* clarified that its rule requiring a plaintiff to show that the policy is vague as applied to him or her "makes no exception for conduct in the form of speech." 561 U.S. at 20. Second, Cahall does not base her vagueness challenge here on her First Amendment rights to free expression. And that is probably a wise choice in light of (1) case law holding that teachers do not have a First Amendment right to make "curricular and pedagogical choices" of their own liking, *Evans-Marshall*, 624 F.3d at 340, as well as (2) case law more generally limiting the scope of First Amendment protection in connection with public-employee work-related speech, *see, e.g.*, *Garcetti v. Ceballos*, 547 U.S. 410 (2006). Rather, her complaint is a plain-vanilla due-process

17

void-for-vagueness claim attacking the discipline that she received under the policy, and thus the *Hoffman Estates* carve-out simply is not relevant.[6]

As to void-for-vagueness claims like the one Cahall actually advances here, the Supreme Court's rule from *Holder* applies with full force. And under that rule, so long as the policy is sufficiently clear as applied to the facts at issue, the plaintiff lacks a viable facial or as-applied challenge. 561 U.S. at 18–19. Or in other words, a plaintiff challenging punitive consequences on void-for-vagueness grounds must show that the challenged policy is void in their particular circumstances. *Id.*

That requirement imposes an insurmountable hurdle for Cahall. She argues that the terms "controversial issue" and "instructional program" in the policies are too vague. (Doc. 1, #16–17). And in some abstract sense, that might be true. The exact contours of each phrase may be difficult for a "person of ordinary intelligence" to

---

[6] In her Notice of Supplemental Authority (Doc. 24-1), Cahall points to *NAACP v. U.S. Dept. of Educ.*, 779 F. Supp. 3d 53 (D.D.C. 2025), and *NEA v. U.S. Dept. of Educ.*, 779 F. Supp. 3d 149 (D.N.H. 2025). Because such notices are not an appropriate vehicle for argument, she rightly does not provide much by way of analysis in connection with the cases. But it appears she believes they bolster her void-for-vagueness challenges, as both cases challenge on vagueness grounds a "Dear Colleague Letter" from the U.S. Department of Education regarding DEI practices in schools. In connection with that, the New Hampshire case has language arguably suggesting that, in analyzing facial challenges on vagueness grounds, the "impermissibly vague in all its applications" requirement no longer applies. *NEA*, 779 F. Supp. 3d at 185–86. If true, that could also undercut the basis for the rule that a plaintiff making a facial challenge must show that the provision is vague as applied to her *own* conduct. But that does not change the Court's result here for two reasons. First, *NEA* and *NAACP* both involved what amounted to pre-enforcement challenges, so there were no particularized facts. Second, the plaintiffs there were challenging the "Dear Colleague Letter" on free speech grounds, and the plaintiffs and defendants were not in an employee/employer setting. Here, by contrast, that is not the case. So the *Hoffman Estates* notion that different rules apply in free-speech settings more squarely comes into play. All that said, to the extent those cases could be read as suggesting that a plaintiff challenging, on void-for vagueness grounds, punishment that she received under a policy does not need to show that the policy was vague as applied to her particular facts, the Court respectfully disagrees.

discern. *Holder*, 561 U.S. at 18. But there is no question that, on the facts here, Cahall knew that the LGBTQ+-themed books that she placed in the classroom related to a "controversial issue." The policy defined "controversial issue" as including "a topic … likely to arouse both support and opposition in the community." (Doc. 1-2). Indeed, Cahall was aware that LGBTQ+ issues had done just that. In response to the District's stated intention to consider being more receptive and open to such issues, parents had complained. (Doc. 1, #8–9). And in response to the District's subsequent decision to retract from that position (based on those parents' complaints), other parents complained. (*Id.* at #9). In short, the topic was not merely "likely to arouse both support and opposition in the community," it in fact had done so. And Cahall knew that. Indeed, in her Complaint, she specifically notes that she added the books to her collection *because of* a "controversy" surrounding LGBTQ+ topics, and she did so precisely because she thought that controversy damaging to the emotional health of LGBTQ+ students in her third-grade class. (Doc. 1, #10–11). A teacher's desire to protect her students' emotional health is a laudable sentiment. But against this backdrop, she, or any other reasonable person of ordinary intelligence, should have known that whatever the precise contours of a "controversial issue," there was no question that it extended to the books at issue here.

Nor is there any meaningful doubt that, under the District's controversial topics policies, she should have known that making the books available to students in her classroom might subject her to discipline. As noted, both the formal policy (2240), (Doc. 1-2), and the administrative guidance (2520A), https://perma.cc/MK7E-

GDYG, make clear that books about controversial topics require pre-approval from the Principal before a teacher includes the books in her classroom supplies and makes them available to students. Indeed, the guideline seems even broader than the policy. It covers the "selection of resource materials" for the District generally, and it provides that "[n]o print … materials which are not part of the District's basic or supplementary materials are to be used with students without prior review and approval." *Id.* Certainly, the books (i.e., resource materials) that Cahall unilaterally selected to add to her in-class library were not "part of the District's basic or supplementary materials," so she perforce should have known that "prior review and approval" was necessary before they were "used with students." *Id.* That the books also addressed what she knew to be "controversial topics" only heightened the prospect that discipline might be forthcoming.

At bottom, the Court agrees with Cahall that the policies here could have been drafted more clearly. And the Court even acknowledges that *other* teachers in *other* situations may lack adequate notice that the conduct in which they are engaged may subject them to disciplinary consequences under these policies. But, on the facts as alleged here, Cahall reasonably should have known that she faced the prospect of discipline. And that means that her void-for-vagueness challenge fails as a matter of law. Moreover, in light of the facts pleaded in her Complaint, there is no way that Cahall could address this shortcoming, so the Court dismisses this claim with prejudice.

### C.  Cahall Has Not Alleged a Viable Equal Protection Claim

Cahall separately asserts an Equal Protection claim. There she alleges that she acted as she did for moral and religious reasons, and that the District treats other teachers who likewise engage in religiously motivated conduct more favorably than her. (Doc. 1, #18–20). Defendants again press two arguments in response. First, they argue that the Equal Protection Clause reaches only intentional discrimination. (Doc. 12, #62). They contend that, when the discrimination at issue is allegedly on religious grounds, a plaintiff must show that the defendant *knew that* plaintiff's conduct was religiously motivated. (*Id.* at #63–64). And here, they say, Cahall allege nothing of the sort. Second, they argue that Cahall's alleged comparator evidence involves sufficiently different conduct that it does not support an equal protection claim. (*Id.* at #64–65). The Court agrees on the latter front and thus does not reach the former.

 To prevail on an Equal Protection claim, a plaintiff must show that the defendant treated her "disparately as compared to similarly situated persons." *Ctr. for Bio-Ethical Reform, Inc. v. Napolitano*, 648 F.3d 365, 379 (6th Cir. 2011) (citation omitted); *Wynn v. City of Covington, Kentucky*, No. 24-5840, 2025 WL 2093032, at *3 (6th Cir. July 25, 2025) (same); *Warman v. Mount St. Joseph Univ.*, 144 F.4th 880, 898 (6th Cir. 2025) ("The Equal Protection Clause prohibits state actors from 'intentionally treat[ing] one differently than others similarly situated without any rational basis for the difference.'") (quoting *TriHealth, Inc. v. Bd. of Comm'rs*, 430 F.3d 783, 788 (6th Cir. 2005)). Similarly situated means similarly situated in *all* relevant respects. *Tree of Life Christian Sch. v. City of Upper Arlington, Ohio*, 905 F.3d 357, 368 (6th Cir. 2018) ("A plaintiff bringing an equal protection claim must be

'similarly situated' to a comparator in 'all relevant respects.'" (quoting *Paterek v. Village of Armada*, 801 F.3d 630, 650 (6th Cir. 2015)). So, at the pleading stage, the plaintiff must allege facts giving rise to a plausible inference that she will be able to make this necessary showing.

Cahall has failed to allege such facts here. Her operative Complaint points to two categories of conduct that, she contends, show how the District treated other employees engaged in religiously motivated activities more favorably than they treated her allegedly-religiously-motivated conduct. First, she alleges that "other teachers, staff and administrators have publicly displayed insignias and symbols of their religious beliefs in the presence of students," such as jewelry depicting Christian crosses. (Doc 1, #12). Second, she alleges that the District allowed other employees to use the email system to "promote various religious or faith-based events," such as "Blessing of Monroe," or "faith-based charitable institutions," such as "Samaritan's Purse." (*Id.*). She notes, however, that these emails were directed to "other teachers, administrators and staff," and she does not allege that the employees were allowed to direct such emails to students. (*Id.*).

Neither category of incidents constitutes plausible comparator evidence—the other employees involved in each are simply not similarly situated to Cahall here. As to the first, teachers arguably have a Free Exercise right to wear jewelry depicting religious symbols. *See Draper v. Logan Cnty. Pub. Libr.*, 403 F. Supp. 2d 608, 623 (W.D. Ky. 2005). But as the District notes elsewhere in its brief, public school teachers do not likewise have a First Amendment right to their own "curricular and

pedagogical choices." *Evans-Marshall*, 624 F.3d at 341. So, policies about how school employees dress stand on different constitutional footing from policies directed at curricular and pedagogical matter. Accordingly, even if, as Cahall alleges, the District allows teachers to wear certain religious items, that is not relevant comparator conduct for discipline imposed on a teacher for violating a policy directed at the books that teacher makes available to her students. If she had alleged, for example, that the District knowingly allows teachers to make Bibles available to their students, on the one hand, while preventing her from making other religiously motivated content available to her students,[7] things may be different, but that is not what her Complaint alleges.

The alleged email incidents likewise do not suffice to create a plausible inference that the District treated "similarly situated" individuals differently on religious grounds. Cahall specifically alleges in her Complaint that the employees in those cases sent the emails *to co-workers*. (Doc. 1, #12). What a public school allows in terms of co-worker communications is subject to different considerations than what

---

[7] For purposes of this Opinion and Order, the Court accepts as true Cahall's allegation that her selection of these books was religiously motivated. At the same time, though, the Court notes that one could argue that sincerely held *moral* beliefs and sincerely held *religious* beliefs are two different (although admittedly often overlapping) categories, and that only the latter receive constitutional protection as a fundamental right. *See Wright v. Honeywell Int'l., Inc.*, 148 F.4th 779, 782 n.3 (5th Cir. 2025) ("For our part, we think it doubtful that the term "religion"—whether in federal statutes or in the Religion Clauses—can be coherently read to include purely moral, ethical, or philosophical beliefs without emptying the term of any distinct meaning."). *But see Davis v. Fort Bend Cnty*, 765 F.3d 480, 485 (5th Cir. 2014), *aff'd on other grounds*, 587 U.S. 541 (2019) (holding that "[b]ona fide religious beliefs include 'moral or ethical beliefs as to what is right and wrong which are sincerely held with the strength of traditional religious views'" (citation omitted)). That, however, is an argument for another day.

the school allows teachers to direct *to students*. Again, if she alleged that the District knowingly allowed teachers to communicate *other* religious messages to students, but prevented her from doing so, it may be a different story. But again, that is not what the Complaint alleges here.

That brings us to Cahall's proposed Amended Complaint. There, she seeks to add an allegation that another teacher displayed a "He is for you" sign in his classroom and yet was not subject to discipline. (Doc. 17-1, #160). This admittedly comes closer to the mark in supporting an Equal Protection claim. "He is for you" arguably could be understood by a reasonable observer as conveying a Christian religious message. And displaying that message on the classroom wall (as Cahall alleges) seems closer to making reading materials available to students than, say, emailing co-workers or wearing religious jewelry does.

But as to this incident, another shortcoming arises—Cahall nowhere alleges that District personnel understood the sign to convey a religious message, or indeed that the District was even aware that the teacher was displaying the sign in the classroom. (In fact, while neither party cites it, the District's policy manual states that "no devotional exercises or displays of a religious character will be permitted in the District in the conduct of any program or activity under the jurisdiction of the Board." (Policy 2270, https://perma.cc/R8FT-SF98).) So there are no factual allegations that give rise to a plausible inference that the District intentionally *chose* to treat the one teacher's message differently from the other's from a disciplinary standpoint. But such a choice would be a prerequisite to an Equal Protection claim.

24

*See Warman*, 144 F.4th at 898 ("The Equal Protection Clause prohibits state actors from 'intentionally treat[ing] one differently than others similarly situated without any rational basis for the difference.'" (quoting *TriHealth,*430 F.3d at 788)).

In short, whether considered in light of the original Complaint or the proposed Amended Complaint, Cahall's Equal Protection claim falls short. That said, it is perhaps possible that Cahall could address these deficiencies by way of additional allegations, so while the Court dismisses the claim, it does so without prejudice.

**D.    Cahall's Religion Clauses Claim Fails as a Matter of Law.**

Separately, Cahall repackages the Equal Protection claim of religious discrimination as a direct claim under the Free Exercise and Establishment Clauses. (Doc. 1, #21–23). But her claim is no more viable on those grounds.

To the extent that she relies on the Free Exercise Clause, she runs headlong into the same problems already noted above—teachers do not have a First Amendment right (whether under its free speech component or its free exercise component) to make their own "curricular and pedagogical choices" in a public school. *Evans-Marshall*, 624 F.3d at 341. If Cahall wants to keep religious materials for her own use—for example, a Bible in a desk drawer that she reads herself during free time—the analysis gets more difficult. Or similarly if she wants to speak as a citizen on matters relating to LGBTQ+ or other issues—for example, commenting at a Board meeting—a *Pickering* balancing test analysis may well be required. *See generally Pickering v. Bd. of Educ. Of Twp. High Sch. Dist. 205, Will Cnty, Ill.*, 391 U.S. 563 (1968). But the District pays her to instruct students, and as part of that, it has the

right to specify the materials that she uses to accomplish that objective. *Evans-Marshall*, 624 F.3d at 341.

True, *Evans-Marshall* itself involved books that the teacher used for classroom instruction. And Cahall alleges she does not "teach" from the books here. (Doc. 1, #14). But the rule in *Evans-Marshall* did not turn on the precise manner in which the teacher *used* the books. Rather, the *Evans-Marshall* court said the relevant question was whether the teacher had engaged in the conduct at issue "pursuant to" her duties as a public-school teacher. *Id*. at 340 (citing *Garcetti*). That is because, when a teacher acts "pursuant to" her duties, the school administration has a right to control that conduct, much like any employer has a right to control how its employees perform their jobs. And Cahall, in selecting books for her in-classroom library, acted pursuant to her teaching duties. Indeed, she said she selected the books expressly for the purpose of making her LGBTQ+ students feel better, safer, and more supported—all laudable goals, but all also related to, and arising from, her duties as a teacher in the school. (Doc. 1, #12). Stated differently, in her capacity as a citizen, she would not have had the right or authority to add books to the classroom library. Rather, her ability to do so arose solely "pursuant to," *see Garcetti*, her position as the classroom teacher. Thus, just as in *Evans-Marshall*, the school district had a right as an employer to constrain the manner in which she made those choices.

Cahall also invokes the Establishment Clause. Her claim on this front appears to be that the District chose to treat *other* religious expressions, by *other* school personnel, better than hers. (Doc. 1, #21 (alleging that the Superintendent was

"aiding, fostering, or promoting one religion or religious viewpoint over another," and further characterizing that as "unlawful discriminatory treatment")). That is a sound starting point—disparate state treatment of differing religions can provide the basis for an Establishment Clause claim. *See, e.g., Prater v. City of Burnside, Ky.*, 289 F.3d 417, 431 (6th Cir. 2002) (noting that the Establishment Clause, "among other things, prohibits the government from preferring one religion over another"). But assuming that is her claim, it fails on the alleged facts here for the same reasons already set forth above as to her Equal Protection claim—she has not plausibly alleged that a similarly-situated employee was treated more favorably, and thus has not plausibly alleged that the District is favoring one religion over another.

 If instead she is arguing that she has some kind of constitutional right to share her religiously motivated beliefs, the Establishment Clause actually works *against* her. The Establishment Clause prohibits public schools, and thus by extension their teachers, from attempting to indoctrinate students with any particular religion. *See, e.g.*, *Edwards v. Aguillard*, 482 U.S. 578 (1987). True, questions could be asked as to whether the books at issue here are actually "religious" for purposes of the Establishment Clause. *See supra* n.4. But if they are not religious, then this is merely a dispute about whether certain secular materials should be allowed in the classroom, and the Establishment Clause has nothing to say on that topic.

All of that said, for the same reason that the Court dismisses the Equal Protection Clause claim without prejudice, the Court will also dismiss the Religion Clause claims without prejudice.

**E.** **Without an Underlying Constitutional Violation, the Ohio Law Claim Fails.**

That leaves Cahall's state-law claim under the combination of Ohio Revised Code § 2921.45 and § 2307.60. (Doc. 1, #23–24). In light of the Court's determinations above, this claim is a non-starter. The state-law claim seeks to impose civil liability on the Defendants, as state actors, for allegedly violating Cahall's constitutional rights. (*Id.*). Specifically, the first of the two cited statutes makes it criminal for state actors to violate a person's constitutional rights, and the second provides a civil cause of action for anyone harmed by a criminal violation. Ohio Rev. Code §§ 2307.60, 2921.45. But for the reasons set forth above, Cahall has failed to allege a viable constitutional claim. And without an underlying constitutional violation, there is no predicate conduct to serve as the basis for a criminal claim under § 2921.45, in turn meaning there is no civil cause of action under § 2307.60. So this claim fails. But again, as the Court has dismissed the Equal Protection and Religion Clause claims without prejudice, Cahall may be able to revive this state-law claim if she can address the shortcomings that the Court identified in those constitutional claims. Accordingly, the Court dismisses this claim without prejudice.

**CONCLUSION**

For the above reasons, the Court **GRANTS** Defendants' Motion for Judgment on the Pleadings (Doc. 12). As a result, the Court **DISMISSES** Cahall's action. The dismissal is **WITH PREJUDICE** as to her official-capacity claims against Tracey Miller and the Board members and her void-for-vagueness claims (Counts One and Two). But the dismissal is **WITHOUT PREJUDICE** as to her Equal Protection

Claim (Count Three), her Free Exercise Clause and Establishment Clause claim (Count Four), and her state-law claim (Count Five). The Court further **DENIES** Cahall's Motion for Leave to Amend (Doc. 17) on futility grounds. The Clerk is **DIRECTED** to enter judgment consistent with this Opinion and **TERMINATE** this matter on the Court's docket.

       **SO ORDERED.**

September 29, 2025
**DATE**

                          **DOUGLAS R. COLE**
                          **UNITED STATES DISTRICT JUDGE**